**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 92-8257
Summary Calendar
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ZACARIAS RODRIGUEZ-RIOS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

(May 5, 1993)

Before HIGGINBOTHAM, SMITH, and DeMOSS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Zacarias Rodriguez-Rios (a.k.a. Leonel Vargas-Lopez) appeals his conviction on one count of making a false, fictitious, or fraudulent representation of a material fact in violation of 18 U.S.C. § 1001. We reverse.

I.

On May 19, 1991, Rodriguez was viewed by a United States Customs agent as he was exiting an airplane at the airport in Santa

Teresa, New Mexico.  Rodriguez placed the suitcase in the trunk of a Mercury Cougar sporting a paper license plate in its rear window and driven by a young woman.  Rodriguez then entered the passenger side of the vehicle and proceeded to the Bridge of the Americas Port of Entry, which divides El Paso, Texas, from Juarez, Mexico.

Customs agents followed Rodriguez from the airport to the bridge and stopped him just before he could cross the border.  Agent McCarthy informed Rodriguez that he was conducting a routine export examination and asked, among other things, how much money Rodriguez had with him.  Rodriguez responded, "About a thousand dollars," and removed what turned out to be $1,400 from his pocket.

McCarthy continued to question Rodriguez, asking him whether anything in the trunk belonged to him.  His suspicions apparently aroused, Rodriguez inquired as to the agent's purpose, whereupon McCarthy repeated that it was a routine export examination.  McCarthy next asked Rodriguez where he had flown from before arriving in Santa Teresa, and Rodriguez replied that he had left Springfield, Illinois, for Santa Teresa in a private aircraft and that he was a personal assistant to the mayor of Juarez.  When McCarthy again asked Rodriguez how much money he was carrying, he made no reply.  When asked whether anything in the trunk belonged to him, Rodriguez stated, "That depends on why you are asking." McCarthy again asked how much money he had, but this time Rodriguez answered that he did not know.

At approximately this point, Rodriguez was taken inside the Customs office and advised in Spanish by customs inspector Vega of

the currency reporting requirement )) that it is not illegal to leave the country with more than $10,000, but that he must complete a Customs Form 4790 Currency Monetary Instrument Report declaring any sum in excess of that amount. Vega then asked Rodriguez whether he had more than $10,000 with him and whether he had filled out the required form. Rodriguez did not respond to these questions, and Vega testified that his body mannerisms were evasive. When McCarthy again asked whether any of the suitcases in the trunk were his, and Rodriguez reiterated that "[i]t depends on why you are asking," the vehicle was moved into a secondary inspection area, and Rodriguez and the female driver were taken inside the customs office.

Two narcotics dogs were then brought to inspect the car; the first alerted to its exterior, and the second sniffed the packages in the open trunk and alerted to both the black suitcase and a shoebox wrapped with duct tape. Both were opened and found to be filled with United States currency in the approximate sum of $598,000.

Meanwhile, back in the customs office, Rodriguez was asked to fill out a Form 4790. Acknowledging that the money was his, Rodriguez began to fill out the report with agent Straba's assistance. Straba restated the currency reporting requirements, again assuring Rodriguez that he could take any sum out of the country so long as he declared it in writing. Apparently finished, Rodriguez placed the form on the counter, but when Straba picked it up, Rodriguez took the form from him and folded it into his pocket,

3

saying he did not wish to give it to Straba. Nonetheless, Straba had seen enough of the form to notice that it declared an amount of $530,000.

When informed that large amounts of cash had been discovered in the trunk, Straba proceeded to arrest Rodriguez, who refused to speak to the agents until he could consult with an attorney. Later, Rodriguez changed his mind and agreed to talk. He requested a second opportunity to complete a reporting form, was provided one, and stated in writing that he was exporting $500,000.

On June 5, 1991, a federal grand jury returned a two-count indictment against Rodriguez, charging him with failing to file the prescribed report for the transportation of currency and monetary instruments of more than $10,000 in violation of 31 U.S.C. § 5316(a)(1)(A) and 5322(a) (first count), and the making of a false, fictitious, or fraudulent statement or representation in violation of 18 U.S.C. § 1001 (second count). After a bench trial, the court dismissed the first count for insufficient evidence but found Rodriguez guilty on the second count.


II.

The district court predicated Rodriguez's conviction on his initial statement that he was carrying no more than $1,000. Rodriguez contends that this initial statement fits within the "exculpatory no" exception to 18 U.S.C. § 1001, which provides that "a generally negative and exculpatory response made by a subject of a criminal investigation in reply to questions directed to him by

4

investigating officers is not a crime under §1001." United States v. Krause, 507 F.2d 113, 117 (5th Cir. 1975); see also United States v. Paternostro, 311 F.2d 298, 305 (5th Cir. 1962).

In United States v. Schnaiderman, 568 F.2d 1208, 1213-14 (5th Cir. 1978), we recognized the applicability of the "exculpatory no" exception in a situation nearly identical to the instant one. There, the defendant was a Venezuelan resident entering the United States through the Miami International Airport. When entering customs, he was asked whether he was carrying more than $5,000, at that time the triggering sum for the reporting requirement. Schnaiderman replied "No" and checked the appropriate box on the customs declaration form. A second customs officer, observing Schnaiderman's bulging pockets and nervous demeanor, asked him to empty his pockets, which contained $8,086 in currency. It was only at this point that Schnaiderman was asked whether he understood the currency laws, to which he gave a negative response. Id. at 1210.

Because we found no evidence that Schnaiderman "aggressively and deliberately initiate[d] any positive or affirmative statement calculated to pervert the legitimate functions of government," id. at 1213 (quoting Paternostro, 311 F.2d at 305) (internal quotation marks omitted), we reversed his conviction under section 1001. As we stated,

> Perversion of a governmental body's function is the hallmark of a § 1001 offense. The "function" of the customs agent at issue here is to assure that the transportation of more than $5,000 into the United States is reported. We cannot say Schnaiderman attempted to pervert something he may not even have known about and as to which we now have twice held, he was entitled to affirmative advice that such a report was required.

5

<u>Schnaiderman</u>, <u>id.</u> (citations and internal quotations omitted).

The difficulty here is that, unlike Schnaiderman, Rodriguez ultimately was informed of the currency reporting requirement and the fact that it is not illegal to take more than $10,000 out of the country, so long as it is declared. The question then becomes whether Rodriguez's refusal to recant his original misstatement <u>after</u> he was informed of the reporting requirement renders the "exculpatory no" exception inapplicable to his case. The government contends that it does and cites us to two cases, <u>United States v. Anderez</u>, 661 F.2d 404, 408-09 (5th Cir. Unit B Nov. 1981), and <u>United States v. Berisha</u>, 925 F.2d 791, 796 (5th Cir. 1991).

<u>Berisha</u> is readily distinguishable. When the defendant in that case was asked whether he was carrying more than $10,000, he stated that he had only the $8,000 in his pants pocket. Upon being informed of the reporting requirement, Berisha stated that he was aware of the reporting requirement, but he insisted again that he had only the $8,000. Thus, we held <u>Schnaiderman</u> inapposite, as Berisha had repeated his false denial even after being informed of the reporting requirement. <u>Berisha</u>, 925 F.2d at 796. Indeed, given that Berisha admitted knowledge of the reporting requirement, it would seem the "exculpatory no" doctrine would not have been available, even for his first misstatement.

In <u>Anderez</u>, the facts were almost identical. Anderez checked the "no" box on his customs declaration form where it asked whether he was carrying more than $5,000. A customs official subsequently checked Anderez's luggage and asked him whether he was carrying

6

more than $5,000, at the same time informing him of the legality of exceeding that amount and the need to comply with the reporting requirement. Anderez then affirmatively stated that he had only $1,800 with him. The suspicious bulges around Anderez's waist suggested otherwise, however, and his arrest was underway. Anderez, 661 F.2d at 405-06.

Anderez admittedly puts us a closer case than Berisha, however, as the court declared the "exculpatory no" exception unavailable where Anderez "chose to continue in his falsehood after being told that the act he sought to conceal was not illegal . . . ." Id. at 409. Although Anderez's misstatements "may have occurred slightly before [Customs Inspector] Nerren's assurances,"[1] and therefore ostensibly came within Schnaiderman, nevertheless "the two were part of a single exchange between Nerren and Anderez." Id. The opinion further seems to suggest an affirmative duty on the part of the defendant to clear up any false impressions his prior misstatement might otherwise leave: "Once informed that he could bring more than $5,000 into the country Anderez easily could have recanted and told the truth. He could have avoided liability by changing his answers on the original customs form and completing the secondary currency form." Id.

The instant case is somewhat different, however. Rodriguez initially filled out no customs form, and once offered one, he

---

[1] We are somewhat puzzled by the Anderez majority's characterization of the facts of the case, inasmuch as Anderez's affirmative oral misrepresentation transpired after he was informed of the reporting requirement, not before. Although the majority thus treats the case as closer to Rodriguez's situation, it is in fact entirely assimilable to Berisha.

entered a sum at least approximating the amount discovered by the agents. Moreover, Rodriguez did not "continue in his falsehood"; admittedly, he did not clear up any false impression his initial denial may have created, but neither did he restate misleading facts or affirmatively deny that he was carrying more than $10,000. At the time it was made, his statement that he was carrying only $1,000 was, to the best of Rodriguez's knowledge,[2] "a generally negative and exculpatory response made by a subject of a criminal investigation in reply to questions directed to him by investigating officers," and therefore was subject to the "exculpatory no" exception to section 1001 liability.

Nor can Rodriguez's refusal to recant his false statement retrospectively alter its essential nature. To be liable under section 1001, Rodriguez would have had to "aggressively and deliberately initiate [a] positive or affirmative statement calculated to pervert the legitimate functions of Government." Paternostro, 311 F.2d at 305. The record does not reveal any such affirmative representation by Rodriguez once he was informed of the reporting requirement, nor can his initial misstatement be transformed ex post into a "calculating" deceit simply by virtue of his failure to recant it. We conclude that the "exculpatory no" doctrine applies and that Rodriguez's conviction under section 1001

---

[2] We are unwilling to accept the government's bare assertions that Rodriguez's self-provided job description implies frequent cross-border travel, which in turn suggests that he must previously have seen the signs at the Bridge of the Americas announcing the currency reporting requirement. Given that the name and social security number Rodriguez initially provided customs agents proved false, we find it highly questionable whether Rodriguez was entirely truthful regarding his occupation, as well. Without more, we are reluctant to credit the government's unsupported speculations.

must be REVERSED.  Because of our disposition of this question, we do not reach the remaining issues raised on this appeal.