**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 92-8257
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ZACARIAS RODRIGUEZ-RIOS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
_____
(February 11, 1994)

Before POLITZ, Chief Judge, KING, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Today we overrule the "exculpatory no" exception to 18 U.S.C. § 1001 as the law in this circuit. We therefore affirm the conviction of Zacarias Rodriguez-Rios ("Rodriguez") of one count of making a false, fictitious, or fraudulent representation of a material fact in violation of § 1001.

I.

We take the following facts from the panel opinion, _United States v. Rodriguez-Rios_, 991 F.2d 167 (5th Cir. 1993). Rodriguez

was viewed by a United States customs agent as he was exiting an airplane at the airport in Santa Teresa, New Mexico. Rodriguez placed a suitcase in the trunk of an automobile sporting a paper license plate in its rear window and driven by a young woman. Rodriguez then entered the passenger side of the vehicle and proceeded to the Bridge of the Americas Port of Entry, which divides El Paso, Texas, from Juarez, Mexico.

Customs agents followed Rodriguez from the airport to the bridge and stopped him just before he could cross the border. Agent McCarthy informed Rodriguez that he was conducting a routine export examination and asked, among other things, how much money Rodriguez had with him. Rodriguez responded, "About a thousand dollars," and removed what turned out to be $1,400 from his pocket.

McCarthy continued to question Rodriguez, asking him whether anything in the trunk belonged to him. His suspicions apparently aroused, Rodriguez inquired as to the agent's purpose, whereupon McCarthy repeated that it was a routine export examination. McCarthy next asked Rodriguez where he had flown from before arriving in Santa Teresa, and Rodriguez replied that he had left Springfield, Illinois, for Santa Teresa in a private aircraft and that he was a personal assistant to the mayor of Juarez.

When McCarthy again asked Rodriguez how much money he was carrying, he made no reply. When asked whether anything in the trunk belonged to him, Rodriguez stated, "That depends on why you are asking." McCarthy again asked how much money he had, but this time Rodriguez answered that he did not know.

Rodriguez was taken inside the customs office and advised in Spanish by customs inspector Vega of the currency reporting requirement )) that it is not illegal to leave the country with more than $10,000, but that he must complete a Customs Form 4790 Currency Monetary Instrument Report declaring any sum in excess of that amount. Vega then asked Rodriguez whether he had more than $10,000 with him and whether he had filled out the required form. Rodriguez did not respond to these questions, and Vega testified that his body mannerisms were evasive. When McCarthy again asked whether any of the suitcases in the trunk were his, and Rodriguez reiterated that "[i]t depends on why you are asking," the vehicle was moved into a secondary inspection area, and Rodriguez and the car's driver were taken inside the customs office.

Two narcotics dogs were brought to inspect the car; the first alerted to its exterior, and the second sniffed the packages in the open trunk and alerted to the suitcase and a shoebox wrapped with duct tape. Both were opened and found to be filled with U.S. currency in the cumulative approximate sum of $598,000.

Meanwhile, back in the customs office, Rodriguez was asked to fill out a Form 4790. Acknowledging that the money was his, Rodriguez began to fill out the report with agent Straba's assistance. Straba restated the currency reporting requirements, again assuring Rodriguez that he could take any sum out of the country so long as he declared it in writing. Apparently finished, Rodriguez placed the form on the counter, but when Straba picked it up, Rodriguez took the form from him and folded it into his pocket, saying he did

3

not wish to give it to Straba. Nonetheless, Straba had seen enough of the form to notice that it declared an amount of $530,000.

When informed that large amounts of cash had been discovered in the trunk, Straba proceeded to arrest Rodriguez, who refused to speak to the agents until he could consult with an attorney. Later, Rodriguez changed his mind and agreed to talk. He requested a second opportunity to complete a reporting form, was provided one, and stated thereon that he was exporting $500,000.

## II.

A federal grand jury returned a two-count indictment charging Rodriguez with failing to file the prescribed report for the transportation of currency and monetary instruments of more than $10,000 in violation of 31 U.S.C. §§ 5316(a)(1)(A) and 5322(a) (first count), and making a false, fictitious, or fraudulent statement or representation in violation of 18 U.S.C. § 1001 (second count). After a bench trial, the court dismissed the first count for insufficient evidence but found Rodriguez guilty on the second.

Rodriguez appealed, arguing that he was protected by the "exculpatory no" exception to § 1001, which provides that "a generally negative and exculpatory response made by a subject of a criminal investigation in reply to questions directed to him by investigating officers is not a crime under § 1001." United States v. Krause, 507 F.2d 113, 117 (5th Cir. 1975). A panel of this court, acknowledging that it was bound by circuit precedent, agreed and reversed the conviction, holding that Rodriguez could not be

4

prosecuted under § 1001 for his initial statement that he was carrying no more than $1,000. United States v. Rodriguez-Rios, 991 F.2d 167, 170 (5th Cir. 1993).[1] We granted a rehearing en banc, id. at 171, in order to re-examine the "exculpatory no" exception, as suggested by one of the panel members, see id. at 170-71 (Higginbotham, J., concurring).

III.

Section 1001 provides,

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully . . . makes any false, fictitious or fraudulent statements or representations, . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1001. Since 1962, this circuit has held that a brief denial of guilt to an investigating federal officer is not punishable under § 1001.[2]

In Paternostro, we held that a policeman's denial that he had received graft money was not punishable under § 1001, because

[1] [t]he appellant in the case at bar made no statement relating to any claim on his behalf against the United States or an agency thereof; [2] he was not seeking to obtain or retain any official position or employment in any agency or department of the Federal Government; and [3] he did not aggressively and deliberately initiate any positive or affirmative statement calculated to pervert the legitimate functions of Government.

---

[1] The issue before the panel was whether Rodriguez's statement that he had only $1,000 fell within the "exculpatory no" exception.

[2] See United States v. Abrahams, 604 F.2d 386 (5th Cir. 1979); United States v. Schnaiderman, 568 F.2d 1208 (5th Cir. 1978); United States v. Bush, 503 F.2d 813 (5th Cir. 1974); United States v. Lambert, 501 F.2d 943, 946 (5th Cir. 1974) (en banc); Paternostro v. United States, 311 F.2d 298 (5th Cir. 1962).

311 F.2d at 305.  Thus, we examined whether any of the three pur-
poses of § 1001 would be vindicated in the case at hand.  Conclud-
ing that they would not, we held that the "exculpatory no" excep-
tion applied.

Subsequent cases have not involved persons lodging claims
against or seeking employment with the government, and therefore
the perversion-of-function rationale has been paramount.[3]  In addi-
tion to the purposes of § 1001, we have relied upon yet another
justification for the exception, reasoning that a literal interpre-
tation would come "uncomfortably close to the Fifth Amendment."
Lambert, 501 F.2d at 946 n.4; see also Bush, 503 F.2d at 818-19.

Seven other circuits have embraced the "exculpatory no" excep-
tion in one form or another.[4]  Some circuits have neither adopted
nor rejected the doctrine.[5]  One circuit has eschewed the excep-
tion.[6]

Of the approaches adopted by the other courts, that of the

---

[3] See Lambert, 501 F.2d at 946 ("Perversion of a governmental body's
function is the hallmark of a § 1001 offense.") (citation omitted);
Schnaiderman, 568 F.2d at 1212 ("This last factor has been critical in the Fifth
Circuit cases . . . .").

[4] See United States v. Taylor, 907 F.2d 801, 804 (8th Cir. 1990); United
States v. Cogdell, 844 F.2d 179, 183 (4th Cir. 1988); United States v. Medina de
Perez, 799 F.2d 540, 545 (9th Cir. 1986); United States v. Tabor, 788 F.2d 714,
717-719 (11th Cir. 1986); United States v. Fitzgibbon, 619 F.2d 874, 879-80
(10th Cir. 1980); United States v. King, 613 F.2d 670, 674-75 (7th Cir. 1980);
United States v. Chevoor, 526 F.2d 178, 184 (1st Cir. 1975), cert. denied, 425
U.S. 935 (1976).

[5] See United States v. Barr, 963 F.2d 641, 647 (3d Cir.), cert. denied,
113 S. Ct. 811 (1992); United States v. White, 887 F.2d 267 (D.C. Cir. 1989);
United States v. Capo, 791 F.2d 1054, 1069 (2d Cir. 1986), vacated on other
grounds, 817 F.2d 947 (2d Cir. 1987).

[6] See United States v. Steele, 933 F.2d 1313, 1320 (6th Cir. 1991), cert.
denied, 112 S. Ct. 303 (1991) (rejecting the five-step test adopted by the Ninth
and Fourth Circuits).

6

Ninth Circuit is especially noteworthy. That court held that a false statement does not violate § 1001 if five requirements are satisfied: (1) the false statement must be unrelated to a claim to a privilege or a claim against the government; (2) the declarant must be responding to inquiries initiated by a federal agency or department; (3) the false statement must not impair the basic functions entrusted by law to the agency; (4) the government's inquiries must not constitute a routine exercise of administrative responsibility; and (5) a truthful answer would have incriminated the declarant. United States v. Equihua-Juarez, 851 F.2d 1222, 1224 (9th Cir. 1988) (citing Medina de Perez, 799 F.2d at 544 n.5).[7]


IV.

The "exculpatory no" exception cannot be found in the plain language of § 1001, which prohibits three possible acts: concealing a material fact, making a false statement, and using a false writing. Although it cannot be discerned immediately from the statute, the "knowingly and willfully" requirement applies to all three types of conduct. See United States v. Lange, 528 F.2d 1280, 1287 (5th Cir. 1976); United States v. Mekjian, 505

_____

[7] Although the Supreme Court has never considered the "exculpatory no" doctrine, it has interpreted § 1001 in three cases. In United States v. Gilliland, 312 U.S. 86 (1941), the Court held that the predecessor to § 1001 was not limited to cases involving pecuniary or property loss to the government. In United States v. Bramblett, 348 U.S. 503 (1955), the Court determined that the Disbursing Office of the House of Representatives is a "department or agency" of the United States within the meaning of § 1001. In United States v. Rodgers, 466 U.S. 475 (1984), the Court concluded that an FBI investigation is under the "jurisdiction" of a federal department or agency within the meaning of § 1001. Although these cases are not controlling, we interpret them as evincing a tendency to apply § 1001 broadly.

F.2d 1320, 1324 (5th Cir. 1975).

The instant case and the "exculpatory no" exception concern the "false statement" portion of § 1001. Thus, the relevant language of § 1001 is this: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully . . . makes any false, fictitious or fraudulent statements or representations . . . ."

A literal interpretation of the statute does not countenance the "exculpatory no" exception. Some courts have found the word "statements" to be a ready textual hook upon which to place concerns about legislative intent. Although that word may connote affirmative, aggressive, or overt declarations, we consider that as a matter of common sense and plain meaning, the word "no" is indeed a statement.

It has been argued that in the phrase "statements and representations," the word "statements" properly should be interpreted to borrow the definition of the word "representations." The court in United States v. Stark, 131 F. Supp. 190, 205 (D. Md. 1955), stated,

> And it must be noted that in the alternative and broadening prohibition included in the 1934 amendment the word "statements" is closely associated with the word "representations" which connotes the kind of a statement that is intended to be acted on by the person to whom made. That is, the ordinary legal concept of representation at various fields of jurisprudence, and would seem to have similar meaning in this statute. 37 Words and Phrases, pp. 35, et seq.

It is likely, however, that by including "statements" with "representations," Congress did not intend the scope of § 1001 to

8

be limited to representations. In other words, we abide, where possible, by the general rule of statutory construction that requires us to give meaning to every portion of a statute. See United States v. Nordic Village, Inc., 112 S. Ct. 1011, 1015 (1992).

In Stark, the court also suggested that because other actions condemned by § 1001 are aggressive actions (For example, it prohibits falsifying or concealing or covering up by any trick, scheme, or device a material fact.), "statements" must mean only aggressive, or inducing, statements.[8] We are not convinced by this ejusdem generis argument. It is just as likely that Congress used broader language in the "false statement" clause in order to distinguish false statements from other types of prohibited conduct.

We are authorized to deviate from the literal language of a statute only if the plain language would lead to absurd results, or if such an interpretation would defeat the intent of Congress.[9] Most recently, the Supreme Court has admonished that "[w]hen we

---

[8] The Stark court reasoned,

[W]e also find in the same closely worded phraseology that the statement must have been knowingly and willfully made or concealed or accompanied by some trick, scheme, or device and must relate to a material fact. Again, in close verbal association are specified various types of false statements such as bills, receipts, vouchers, rolls, accounts, claims, certificates, affidavits or depositions.

131 F. Supp. at 205-06 (referring to the 1934 predecessor of § 1001).

[9] United States v. Katz, 271 U.S. 354, 362 (1926) ("General terms descriptive of a class of persons made subject to a criminal statute may and should be limited where the literal application . . . would lead to extreme or absurd results, and where the legislative purpose gathered from the whole Act would be satisfied by a more limited interpretation."); Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 109 (1980).

9

find the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances." Demarest v. Manspeaker, 498 U.S. 184, 190 (1991) (citations omitted). Thus, we are told to follow a statute's plain meaning unless "[w]e can[] say that [it] is so bizarre that Congress `could not have intended' it." Id. at 191 (quoting Griffin v. Oceanic Contractors, 458 U.S. 564, 575 (1982)). Accord Nicklos Drilling Co. v. Cowart, 927 F.2d 828, 831-32 (5th Cir. 1991) (en banc), aff'd, 112 S. Ct. 2589 (1992) (per curiam). Finding no such reason to deviate from the plain language of § 1001, we now discard the "exculpatory no" doctrine in this circuit.

V.

It is said that the purpose of § 1001 is to protect the government from practices that would pervert its legitimate functions.[10] The principal purpose of the "exculpatory no" exception, on the other hand, is to exclude from coverage those

---

[10] See Gilliland, 312 U.S. at 93:

> The [1934] amendment eliminated the words "cheating and swindling" and broadened the provision so as to leave no adequate basis for the limited construction which had previously obtained. The statute was made to embrace false and fraudulent statements or representations where these were knowingly and willfully used in documents or affidavits "in any matter within the jurisdiction of any department or agency of the United States." In this, there was no restriction to cases involving pecuniary or property loss to the government. The amendment indicated the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described.

Accord Stark, 131 F. Supp. at 202 ("[T]he kind of statements which are proscribed are those which necessarily have important relation to the protection of the authorized functions of the governmental departments and agencies from perversion which might result from this kind of deceptive practices which are prohibited.").

statements that do not so threaten.[11]  We conclude, however, that § 1001 should not be limited to those statements that pervert governmental functions but should be determined by the text and not by a judicial reconstruction of its purpose.

A.

In Gilliland, the Court refused to limit § 1001's predecessor to the narrow task of aiding the punishment of those who produced, transported, or removed oil in contravention of § 9(c) of the National Industrial Recovery Act of 1933 (the "NIRA").[12]  Such oil

---

[11] See United States v. Anderez, 661 F.2d 404, 409 (5th Cir. Unit B Nov. 1981) ("The exculpatory no doctrine developed because this court believed that Congress intended section 1001 to punish only positive false statements that would pervert governmental functions.") (citations omitted).  The "exculpatory no" doctrine vindicates the statutory purpose, because short exculpatory statements seldom pervert any governmental function. United States v. Lambert, 501 F.2d 943, 947 (5th Cir. 1974) (en banc) ("We note, too, that an exculpatory denial by a person under investigation may have less potential for misleading the Bureau and perverting its function than a discursive voluntary statement involving the suggestion that persons other than the maker of the statement are guilty of federal crimes.") (footnote omitted).  In Bush, we interpreted the "exculpatory no" doctrine to distinguish "cases wherein a false written net worth statement was voluntarily prepared and submitted to the Internal Revenue agents for the purpose of misleading the IRS." Bush, 503 F.2d at 818 (emphasis added).

Nowhere is the perversion-of-government rationale more evident than in the currency reporting cases.  The Bank Secrecy Act, 31 U.S.C. § 1101, requires a person to report the transfer of more than $10,000 across a United States border.  Travelers entering the country are asked to fill out a customs form asking whether they are carrying more than $10,000 in currency.  We have held that a traveler who answers "no" to the question is not criminally liable if he does not know of the reporting requirement. Schnaiderman, 568 F.2d at 1208.  We reasoned that for § 1001 to be implicated, "the government would have to demonstrate a knowing and willful intent to pervert the purpose of the Bank Secrecy Act." Id. at 1213.  Conversely, if the declarant has been apprised of the currency disclosure law, the "exculpatory no" doctrine is not available. United States v. Berisha, 925 F.2d 791, 794 (5th Cir. 1991).

[12] Pub. L. No. 73-67, ch. 90, 48 Stat. 195, 200.  Section 9(c) was declared unconstitutional in Panama Refining Co. v. Ryan, 293 U.S. 388 (1935). Congress attempted to cure the constitutional defects, passing a substitute in 1935.  The "Hot Oil" Act, Pub. L. No. 74-14, 49 Stat. 30 (1935).

illegally produced was referred to as "hot oil."[13]  Just as the
Court rejected the idea that the scope of § 1001's predecessor
should be limited to prosecutions under the NIRA, we discard the
proposition that § 1001 should be limited to a broader formulation
of congressional intent, that of preventing perversions of
government functions.

Section 1001 has its origins in the Civil War:  The original
version was passed in 1863.  Act of March 2, 1863, ch. 67, 12 Stat.
696; see United States v. Bramblett, 348 U.S. 503, 504 (1955).  One
clause of the statute made it a criminal offense for a member of
the armed forces to make a false claim, specifically, for

> any person in the land or naval forces of the United
> States . . . [to] make or cause to be made, or present
> or cause to be presented for payment or approval to or
> by any person or officer in the civil or military
> service of the United States, any claim upon or against
> the Government of the United States, or any department
> or officer thereof, knowing such claim to be false,
> fictitious, or fraudulent . . . .

12 Stat. 696.  A second clause dealt with statements that
buttressed false claims.  It was illegal for

> any person in such forces or service who shall, for the
> purpose of obtaining, or aiding in obtaining, the
> approval or payment of such claim, make, use, or cause
> to be made or used, any false bill, receipt, voucher,
> entry, roll, account, claim, statement, certificate,
> affidavit, or deposition, knowing the same to contain
> any false or fraudulent statement or entry.

In 1873, when the statute was codified as Revised Statute

---

[13] See Panama Refining, 293 U.S. at 418 (defining "hot oil" as "oil
exceeding state allowances"); but see William J. Schwartz, Note, Fairness in
Criminal Investigations Under the Federal False Statement Statute, 77 Colum. L. Rev.
316, 317 n.11 (1977) ("`Hot oil' was oil produced cheaply enough to be sold for
less than the parity price established under regulations promulgated under the
[NIRA].").

§ 5438, Congress amended the penalty provisions and modified the statute to cover "every person," not just military personnel. Act of Dec. 1, 1873, § 5438, 18 Stat. 1054-55; see Bramblett, 348 U.S. at 506 n.2. In 1908, the penalty provisions again were amended. Act of May 30, 1908, Pub. L. No. 60-175, § 5438, 35 Stat. 555; see Bramblett, 348 U.S. at 506 n.2. In 1909, the statute was redesignated as § 35. Act of March 4, 1909, Pub. L. No. 60-350, § 35, 35 Stat. 1088, 1095; see Bramblett, 348 U.S. at 506 n.2.

In 1918, Congress modified the false statement portion of the statute so that it required a purpose to cheat and swindle or defraud the government. Act of Oct. 23, 1918, Pub. L. No. 65-228, § 35, 40 Stat. 1015-16. The new language provided that

> whoever, for the purpose of obtaining or aiding to obtain the payment or approval of such a claim, or for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry; . . . shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Id. (emphasis added).

In 1934, the purpose requirement was removed at the behest of the Secretary of the Interior, who wished to use the statute to

13

enforce § 9(c) of the NIRA.[14]  The purpose requirement of pecuniary or property loss in the earlier, 1918 version had prevented the statute from being used to enforce the NIRA.  Gilliland, 312 U.S. at 94.[15]

> After the 1934 amendment, the relevant language read,

> or whoever, shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, in any matter within the jurisdiction of any department or agency of the United States or of any corporation in which the United States of America is a stockholder; . . . shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Act of June 18, 1934, Pub. L. No. 73-394, § 35, 48 Stat. 996. Subsequent legislative changes were substantively unimportant. Bramblett, 348 U.S. at 508.[16]

_____

[14] See Gilliland, 312 U.S. at 93-94 ("Legislation had been sought by the Secretary of the Interior to aid the enforcement of laws relating to the functions of the Department of the Interior and, in particular, to the enforcement of regulations under § 9(c) of the [NIRA]."); id. at 94 (after the President objected to the original legislation, "[a]nother measure was then proposed by the Secretary of the Interior which would obviate these objections and accomplish the purpose of reaching the presentation of false papers in relation to `hot oil.'"); id. at 94-95 (citing S. Rep. No. 1202, 73d Cong., 2d sess.) ("The report of the Judiciary Committee of the Senate stated that the amendment in question had been proposed by the Department of the Interior with the purpose `of reaching a large number of cases involving the shipment of "hot" oil, where false papers are presented in connection therewith.'").

[15] The purpose requirement contained in the 1918 version had been construed to mean that the United States suffer (or perhaps, be intended to suffer) "pecuniary or property loss." Id. at 92 (citing United States v. Cohn, 270 U.S. 339, 346-47 (1926). A sale of "hot oil" did not cause such a loss. Any loss would be suffered by other oil producers, not by the government, as the other oil producers would face a reduction in profit following the slight decrease in the price of oil caused by a sale of "hot oil."

[16] In 1938, Congress subdivided § 35 into separate parts but did not change the substance of the false statement language. Act of Apr. 4, 1938, Pub. L. No. 75-465, § 35,  52 Stat. 197; Bramblett, 348 U.S. at 508 n.8.  In 1948, the false claims and false statement portions were split up, the false claims
(continued...)

14

In Gilliland, the Court rejected the argument that the predecessor to § 1001 should be restricted to the narrow purpose of the 1934 amendment of aiding in the enforcement of the NIRA. The Court stated,

> The fact that the Secretary of the Interior was then seeking aid in the enforcement of § 9(c) of the [NIRA], which this Court later found to be invalid (Panama Refining Co. v. Ryan, 293 U.S. 388), in no way affects the present application of the statute. Its provisions were not limited to the enforcement of § 9(c) of the [NIRA] but were enacted with appropriate breadth so that they at once applied to the presentation of affidavits, reports, etc., required by the subsequent Act of February 22, 1935, and the regulations duly prescribed thereunder.

Gilliland, 312 U.S. at 95.

Thus, the Court approached the statute by looking not at its purpose, but at its plain language.[17] By the same token, we should not restrict § 1001 to only false statements that pervert legitimate governmental functions.

B.

Until 1934, the predecessor to § 1001 applied only to statements that were made "for the purpose of obtaining or aiding to obtain the payment or approval of such a claim, or for the purpose and with the intent of cheating and swindling or

_____

(...continued)
portion becoming 18 U.S.C. § 287 and the false statement provision becoming the present 18 U.S.C. § 1001. Act of June 25, 1948, Pub. L. No. 80-772, 62 Stat. 683. Bramblett, 348 U.S. at 508. The reference to corporations was deleted, and the "in any matter" clause was moved to the beginning of the section.

[17] Note that although the Court stated that the purpose of § 1001's predecessor was to deter perversions of governmental functions, the Court refused to limit the statute to the "hot oil" rationale, not because the rationale was an inaccurate characterization of the statute's purpose, but because such a limitation would conflict with its text.

15

defrauding" the federal government.[18] The "exculpatory no" exception is used to resurrect a requirement similar to this "purpose" requirement, as part of the Paternostro test seeks to determine whether the declarant "aggressively and deliberately initiate[d] any positive or affirmative statement calculated to pervert the legislative functions of government." Paternostro, 311 F.2d at 305 (emphasis added).

The brief presence of a "purpose" requirement demonstrated that when Congress wished to restrict the scope of § 1001 to statements made for certain purposes, it did so explicitly.[19] Therefore, even if it were necessary to go beyond the statute's plain meaning, the "exculpatory no" exception defies the legislative history of § 1001.

VI.

One criticism of a literal interpretation of § 1001 is that Congress simply could not have intended such a broad interpretation.[20] We note the difficulty with ascertaining the

---

[18] Apparently, the "for the purpose" language was replaced with the phrase "in any matter within the jurisdiction of any department or agency of the United States or of any corporation in which the United States of America is a stockholder." Bramblett, 348 U.S. at 507-08.

[19] Subsequently, Congress has considered, but failed to pass, one bill that required prosecutions under § 1001 to be based upon a recorded conversation made with the declarant's knowledge and another bill that required the government to have advised defendants that lying was a crime. Giles A. Birch, Comment, False Statements to Federal Agents: Induced Lies and the Exculpatory No, 57 U. CHI. L. REV. 1273, 1291 n.82 (1990) (citing Criminal Code Revision Act of 1980, H.R. 6915, 96th Cong., 2d Sess., § 1742 (1980); Criminal Code Reform Act of 1981, S. 1630, 97th Cong., 1st Sess. § 1343(a)(1)(A) (1981)).

[20] United States v. Bedore, 455 F.2d 1109, 1110 (9th Cir. 1972); Stark, 131 F. Supp. at 207 ("The sweeping generality of the language of section 1001, especially when isolated as it appears in the 1948 revision from the remainder
(continued...)

16

congressional intent behind the provision. Furthermore, the section's language carries its own restraints.

First, any violation of § 1001 must be knowing and willful.[21] Second, any violation must be material. United States v. Krause, 507 F.2d 113, 118 (5th Cir. 1975). Third, not all lies are punished, but only lies within the jurisdiction of the United States Government.

Another argument against a literal construction is that the punishment for a false statement is greater than the punishment for perjury, arguably a more serious crime.[22] We reject this rationale. It would be impossible and inappropriate for us to try to modify the scope of every statute to ensure that it consistently correlates the perceived harm of a crime with the penalty.[23] More

(...continued)
of the 1934 amendment, requires caution in applying it to particular situations.").

[21] On appeal, Rodriguez does not contest whether the statement in question was made "knowingly and willfully." Therefore, we have no cause to consider the intent issue.

The Supreme Court recently has held that the word "willfully" in 31 U.S.C. § 5322(a) requires that a defendant "act[] with knowledge that his conduct was unlawful." Ratzlaf v. United States, 62 U.S.L.W. 4037, 4037 (U.S. Jan. 11, 1994). Section 5322(a) is a criminal enforcement provision that sets out the punishment for a number of substantive criminal offenses, including violation of 31 U.S.C. § 5324, which forbids structuring bank transactions with a "purpose of evading the reporting requirements of [31 U.S.C. §] 5313(a)." Thus, the statutory scheme requires both willfulness and a purpose of evasion.

According to the Court, "willfulness" must require more than the "purpose of evading" in order to be more than mere "surplusage." 62 U.S.L.W. at 4038-39. In contrast to §§ 5322(a) and 5324, however, § 1001 does not contain any purpose requirement. Therefore, the Ratzlaf decision is inapplicable to the present case.

[22] The maximum penalty for perjury is $2,000 or five years in prison. 18 U.S.C. § 1621. The maximum penalty for a violation of § 1001 is $10,000 or five years in prison.

[23] In other circumstances, the Supreme Court has rejected the same argument as a justification for narrowing the scope of § 1001. In Rodgers, the

(continued...)

17

than one hundred federal statutes make false statements illegal. See Schwartz, supra note 13, at 316 n.1. Furthermore, the current scope of the "exculpatory no" exception does not perfectly exclude from punishment all statements that are less deserving of punishment than is perjured testimony.

An additional attack on a literal interpretation of § 1001 is that it would swallow other statutes that make false statements illegal. But multiple statutes often punish the same conduct.[24] Furthermore, even if we believed that Congress intended the false statement statute and other statutes to be mutually exclusive, such an intention would not be furthered by the "exculpatory no" exception, the scope of which is determined by certain characteristics of the statements in question, not by the scope of the other statutes.

---

(...continued)
Court stated,

> The Court of Appeals supported its failure to give the statute a "literal interpretation" by offering several policy arguments in favor of a more limited construction. For example, the court noted that § 1001 carried a penalty exceeding the penalty for perjury and argued that Congress could not have "considered it more serious for one to informally volunteer an untrue statement to an F.B.I. agent than to relate the same story under oath before a court of law." Friedman v. United States, [374 F.2d 363, 366 (8th Cir. 1967)]. A similar argument was made and rejected in United States v. Gilliland, 312 U.S. at 95. The fact that the maximum possible penalty under § 1001 marginally exceeds that for perjury provides no indication of the particular penalties, within the permitted range, that Congress thought appropriate for each of the myriad violations covered by the statute. Section 1001 covers "a variety of offenses and the penalties prescribed were maximum penalties which gave a range for judicial sentences according to the circumstances and gravity of particular violations." Ibid.

466 U.S. at 482-83 (footnotes omitted).

[24] Such cumulative punishment is legal if it does not infringe on a defendant's double jeopardy rights. If violation of one statute automatically proves a violation of another, cumulative application of the two statutes violates the Double Jeopardy Clause unless there is a plain indication of contrary legislative intent to assess cumulative punishment. Whalen v. United States, 445 U.S. 684, 692 (1980).

Some courts have considered making § 1001 applicable to statements only if they are uttered to government agents acting in an administrative, as opposed to an investigatory, capacity. A lie to an investigator may actually aid, not hinder, the investigator. Birch, supra note 19, at 1278. An investigator lacking proof of a substantive offense could ask questions to which he knows the answer. If the answerer lies, he can be convicted of making a false statement, even though he could not be convicted of the underlying offense.

Nonetheless, the potential aggressive use of § 1001 is not so persuasive that we should disregard the language of the statute. The Supreme Court firmly rejected any such investigatory limitation:

> The statutory language clearly encompasses criminal investigations conducted by the FBI and the Secret Service, and nothing in the legislative history indicates that Congress intended a more restricted reach for the statute.

Rodgers, 466 U.S. at 477.

A further rationale advanced for the "exculpatory no" exception is that a mere denial may be insufficient to prove intent.[25] Although this may be true in some circumstances, we are unable to conclude that any person who utters the word "no" to a federal agent lacks the requisite intent to be convicted under § 1001. Therefore, the question of intent should be analyzed

---

[25] Schnaiderman, 568 F.2d at 1213 ("For Schnaiderman's statement to have come within the scope of § 1001 as defined in Lambert, the government would have to demonstrate a knowing and willful intent to pervert the purpose of the Bank Secrecy Act. On the record before us, there is simply no evidence that he had such an intent.").

19

separately from the "exculpatory no" doctrine.

## VII.

The Fifth Amendment right against self-incrimination is not applicable as an independent justification for the "exculpatory no" exception. Although the Fifth Amendment protects a person's right to remain silent in response to an incriminating question, an outright lie is not protected. In Bryson v. United States, 396 U.S. 64, 72 (1969), the Court observed that "[a] citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood." Accord United States v. White, 887 F.2d 267, 274 (D.C. Cir. 1989) (Ruth Bader Ginsburg, J.); Stark, 131 F. Supp. at 207 (Fifth Amendment is "not strictly applicable here"). Thus, while the self-incrimination aspect of the "exculpatory no" exception may somehow be relevant to congressional intent, it is not an independent justification for that exception.

There is a concern that § 1001 forces persons who had committed a crime to choose between lying and incriminating themselves. This concern is not entirely correct. In such a situation, such individuals have the third option of remaining silent )) a choice protected by the Fifth Amendment.[26]

---

[26] This is not to say that remaining silent is not without its drawbacks. Silence may be used to impeach one's testimony in court. Jenkins v. Anderson, 447 U.S. 231, 240 (1980) (evidence of silence may be used to impeach the witness if the witness had not received a Miranda warning). Silence is an unnatural response from which the questioner may infer the suspect's guilt. United States v. Goldfine, 538 F.2d 815, 822 n.2 (9th Cir. 1976); Birch, supra note 19, at 1276.

Nor did the Fifth Amendment play a part in this court's pronouncement of the "exculpatory no" exception. Paternostro, for example, was based upon the premise that mere denial of guilt was not "calculated to pervert the legitimate functions of Government." Paternostro, 311 F.2d at 305. Nor was such a denial a "statement" or a "representation." Id. at 302 (citing Stark).

VIII.

Following oral argument, we instructed the parties to brief the question of whether our decision should apply retroactively. In United States v. Rodgers, 466 U.S. 475, 484 (1984), the Court applied its decision retroactively in holding that the phrase "within the jurisdiction of any department or agency of the United States" included investigations by federal agents, thus overruling Friedman v. United States, 374 F.2d 363 (8th Cir. 1967), which had stood for the proposition that "within the jurisdiction" referred only to "the power to make final or binding determinations." The Rodgers Court reasoned that the critical language of § 1001 was "not sufficiently ambiguous" to warrant prospective application. Furthermore, even if the defendant could show that he relied upon the Friedman case, he could not establish that its reversal was not "reasonably foreseeable."

"Prospective application is not required for due process" where a defendant did not rely upon prior precedent from this court in taking the action in question. United States v. Bachynsky, 934 F.2d 1349, 1362 n.13 (5th Cir.) (en banc), cert. denied, 112 S. Ct.

21

402 (1991). Although the panel relied upon <u>Schnaiderman</u> in invoking the "exculpatory no" exception, <u>see</u> 991 F.2d at 169, the facts of this case do not fit snugly within the circumstance present in <u>Schnaiderman</u>. There, the defendant merely answered "no." Rodriguez's statement, "[a]bout a thousand dollars," is different in degree, and, prior to the panel decision here, no opinion from this court had applied the exception to a statement exactly like Rodriguez's. Moreover, the split in authority among the circuits would make a person less likely to count on prior precedent for protection.

Applying the factors considered by the <u>Rodgers</u> court, we conclude that the unambiguous language of § 1001 supports Rodriguez's conviction, that it is unlikely that Rodriguez relied upon the "exculpatory no" exception, and that it was "reasonably foreseeable" that this court would either restrict or eliminate the "exculpatory no" doctrine.[27] Therefore, our decision applies retroactively.

The judgment of conviction is AFFIRMED.


GARWOOD, Circuit Judge, with whom POLITZ, Chief Judge, JOLLY and HIGGINBOTHAM, Circuit Judges, join, dissenting:

I respectfully dissent from the majority's total overruling of the "exculpatory no" doctrine, a limiting construction of

---

[27] Even if we did not abolish the "exculpatory no" exception, we could limit the exception to negative statements that do not go beyond a simple "no." Such a holding arguably would exclude Rodriguez's answer, "About a thousand dollars," from the benefit of the exception.

22

"statements" as used in 18 U.S.C. § 1001 that, as the majority opinion reflects, has clearly been the law of this Circuit for more than thirty years, has been explicitly recognized by seven other circuits, and has been rejected by none. *Stare decisis* is indeed not an inflexible command. *See, e.g., United States v. Anderson*, 885 F.2d 1248 (5th Cir. 1989). However, the thoroughly established nature of the "exculpatory no" doctrine, in both length of time and frequency of approval by so many decisions of this and other courts, argues strongly against its wholesale rejection at this late date. That is particularly so as today's decision in effect retroactively broadens the reach of section 1001 to criminalize conduct that the courts have so long and often held was not within its scope. *Cf. Bouie v. City of Columbia*, 84 S.Ct. 1697 (1964); *Batiste v. Blackburn*, 786 F.2d 704 (5th Cir. 1986).

While the core of the "exculpatory no" doctrineSQthat in personal questioning initiated by criminal investigating officers, a suspect's mere verbal "no" response is not a section 1001 statementSQis not the only permissible interpretation of section 1001, it is plainly reasonable and has much to recommend it, as reflected by its long and wide acceptance by so many different federal courts. Its expansion beyond this core meaning is more problematical, and appropriate trimming at the fuzzy edges is clearly warranted from time to time. *Cf. United States v. Hajecate*, 683 F.2d 894, 904 (5th Cir. 1982) (dissenting opinion). But this surely does not justify the total uprooting of what has been so long, widely, and clearly established as the settled

limitation of the reach of this criminal statute.