In the

# United States Court of Appeals
## For the Seventh Circuit

No. 08-1215

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CORY L. BRANDT,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 07 CR 57—**Robert L. Miller, Jr.**, *Chief Judge.*

ARGUED SEPTEMBER 15, 2008—DECIDED OCTOBER 27, 2008

Before KANNE, EVANS, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* Defendant Cory Lee Brandt and a co-defendant, Larry Adam Beck, were indicted on June 13, 2007, for crimes related to the sale of an AK-47 rifle on August 18, 2006. Beck was charged under 18 U.S.C. § 922(g)(1) with being a felon in possession of a firearm and ammunition, and Brandt was charged under 18 U.S.C. § 1001(a)(2) with making a false statement to federal agents. Beck pled guilty, and Brandt's trial com-

menced on November 5, 2007. During trial, Brandt moved for a judgment of acquittal, arguing that the government had not proven all elements of the crime beyond a reasonable doubt. The district court denied the motion, which Brandt did not renew. During the jury instruction conference, Brandt requested an instruction based on the "exculpatory no" doctrine. The district court denied the request, citing *Brogan v. United States*, 522 U.S. 398 (1998). Brandt appeals the district court's denial of his motion for a judgment of acquittal and its refusal to grant the requested instruction. We affirm.

## I. BACKGROUND

On August 18, 2006, Brandt and his long-time friend Beck were drinking at Roxie's Manhattan Bar in Mishawaka, Indiana. Beck, a convicted felon, was interested in selling his AK-47 rifle, and asked if Brandt knew of any potential buyers. Brandt stated that he was unsure, but he agreed to make some phone calls on Beck's behalf. Brandt contacted Robert Smith, who expressed an interest in purchasing the rifle, and Brandt informed Beck that he had found a potential buyer. After Brandt arranged a meeting with Smith, Brandt drove Beck home to retrieve the gun. They then met Smith, sold the gun, and returned to the bar to continue drinking. Brandt testified that he took the money and handed the gun to Smith, but that he believed at the time that the transaction was legal.

That night, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") received a tip from local law enforcement about the potential federal firearms viola-

tion. Agent Lucas Battani and Special Agent Craig Edwards began their investigation by interviewing Tara Lemon, Beck's wife. They also interviewed Beck, who by then was in jail for an unrelated altercation, to determine the gun's whereabouts. In the interview, Beck told the agents that he did not know the identity of the buyer but that Brandt, who had brokered the sale, would have this information. Beck testified at trial that after his interview with the ATF agents, Brandt visited him in jail and told him not to say anything about the gun sale.

After interviewing Beck, ATF agents interviewed Asheley James and Brad Sanders, who were present at the bar when Beck and Brandt discussed the sale. Both James and Sanders recounted the same version of events as Beck. Sanders further stated that he had informed Brandt that the ATF was trying to locate him.

On August 24, Agent Battani called a telephone number he believed to be Brandt's. A woman who identified herself as Cynthia Finn answered the phone and confirmed that Brandt was home. Battani and Special Agent Edwards then went to Brandt's home. Brandt agreed to talk to the agents outside. The agents did not record the interview because, in their view, the use of recording devices often intimidates witnesses. Battani did, however, take notes of the interview, which he and Edwards later used to compile their report.

The ATF agents recounted a significantly different version of the ensuing discussion than that of Brandt and Finn. According to the agents' version of events, Battani informed Brandt that they were investigating the sale of a

gun. Battani asked if Brandt and Beck had left the bar on August 18, to which Brandt responded, "No. We had been there all night." Battani then stressed that they were asking about his involvement in the gun sale. Brandt replied that he didn't know what they were talking about. Special Agent Edwards explained that lying to a federal agent was punishable under federal law, and that Brandt was not a suspect but a witness. According to the agents, Brandt replied, "There was no gun."

Agent Battani then recounted to Brandt the agents' discussion with Beck. Brandt retorted that he knew they were lying because he had visited Beck, and Beck had said nothing about speaking with the authorities. The agents explained that they had talked to Beck, that Brandt had not done anything wrong, and that Brandt should tell the truth. According to the agents, Brandt repeated, "There was no gun." Special Agent Edwards explained for a second time that lying to federal agents was a crime and told Brandt that if he told the truth, they would leave. Brandt did not respond.

According to the agents, Battani then asked Brandt if the statement he wished to make was that he and Beck never left the bar, that they had never sold a gun that evening, and that he had no knowledge of a gun. Brandt answered, "Yes, that's what I'm saying." Brandt then asked if they were done. The agents maintain that as Brandt walked back into the house he said, "[Beck] didn't even know the guy."

Brandt's recollection of the interview varies considerably from that of Agent Battani and Special Agent

Edwards. According to Brandt, Battani began by explaining the details of the sale. When Battani reached the point where he described Beck and Brandt's trip to Beck's house, Brandt said, "I don't know what you're talking about." According to Brandt, this statement was an attempt to end the conversation. Brandt testified that the agents grew very upset and asked him if he knew that the punishment for obstructing a federal investigation was up to one year in jail. Brandt then asked if he was under arrest. The agents told him he was not, and Brandt returned to the apartment. Cynthia Finn, who claims to have overheard the conversation from inside the apartment, testified to the same version of events as Brandt.

According to Smith, Brandt called him on August 24 after this encounter with ATF agents and told him that "if everyone just kept their mouth shut then . . . nobody would get in trouble." Brandt later admitted to speaking with Smith on the phone but denied making this statement.

Because the agents were unable to obtain the buyer's name from Brandt, they subpoenaed Brandt's cellular telephone records. These records reflected a number of calls between Brandt and Smith on the day of the sale, as well as two telephone calls from Brandt to Smith on August 24, the same day as the agents' interview with Brandt. The agents then interviewed Smith, who corroborated Beck's version of the gun sale.

Brandt was indicted on June 13, 2007, for making a false statement to federal agents in violation of 18 U.S.C.

§ 1001(a)(2). Brandt's trial commenced on November 5, 2007. At the close of the government's evidence, the court requested that Brandt present his first witness and defer all motions until the end of the day. Accordingly, after Cynthia Finn's testimony, Brandt moved for a judgment of acquittal on the grounds that the government had not proved beyond a reasonable doubt all essential elements of the crime. The court denied the motion, which Brandt did not renew.

During the jury instruction conference, Brandt objected to the court's failure to include the following jury instruction, purportedly gleaned from *United States v. Rodriguez-Rios*, 14 F.3d 1040 (5th Cir. 1994) (en banc)[1]:

> If the defendant's statements were "mere negative responses to questions propounded to him by an investigating agent during a question and answer conference, not initiated by [him] . . ." under circumstances indicating that the defendant was unaware that he was under investigation, then the Defendant's statements may not be material or willful under 18 U.S.C. § 1001 and you may find the Defendant not guilty.

---

[1] In reality, this language is nowhere to be found in the *Rodriguez-Rios* opinion. Instead, it appears to come from previous cases in the Fifth Circuit that had adopted the "exculpatory no" doctrine. *See, e.g., United States v. Abrahams*, 604 F.2d 386, 394 (5th Cir. 1979); *United States v. Paternostro*, 311 F.2d 298, 305 (5th Cir. 1962). In *Rodriguez-Rios*, the Fifth Circuit overruled these cases when it expressly rejected this doctrine as a defense. 14 F.3d at 1045.

The district court had initially denied the instruction based on *Brogan*, which held that the "exculpatory no" doctrine was not a valid defense to liability under § 1001. *See* 522 U.S. at 408. Brandt's counsel, although he had not read *Brogan*, asserted that his proposed instruction was merely "an explanation . . . that the initial negative response was under circumstances that would lead it to be not material or willful under 1001." On this basis he argued that the instruction survived *Brogan*. The court again denied Brandt's request to include the instruction because "it is not an accurate statement of law in light of *Brogan*" and because, in any event, "there was no refusal to speak or a simple denial."

The jury convicted Brandt, who was sentenced to 18 months' imprisonment on January 16, 2008.

## II. ANALYSIS

Brandt raises two issues on appeal. He first argues that the district court incorrectly denied his motion for a judgment of acquittal. Second, he argues that the district court erred in refusing to issue his tendered jury instruction. We discuss each argument in turn.

### A. *The district court's denial of Brandt's motion for a judgment of acquittal*

The district court denied Brandt's motion for a judgment of acquittal on the grounds that there was sufficient evidence from which a jury could find that the govern-

ment had proved beyond a reasonable doubt each of the required elements of § 1001. Brandt argues on appeal that there was insufficient evidence to prove that he willfully or knowingly lied to federal agents. Instead, Brandt argues that he merely asserted his Fifth Amendment right to end the conversation.

A defendant challenging the sufficiency of the evidence always bears a "heavy burden." *United States v. Jackson*, 300 F.3d 740, 747 (7th Cir. 2002). In the ordinary case, "our threshold inquiry is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Farris*, 532 F.3d 615, 618 (7th Cir. 2008) (quotations omitted). But this standard applies only when the defendant renews his motion at the close of all the evidence or within seven days of the jury verdict. *United States v. Hickok*, 77 F.3d 992, 1002 (7th Cir. 1996). Although Brandt moved for a judgment of acquittal during his defense, he did not renew this motion, nor does he respond to the government's assertion that a higher standard applies. *See Farris*, 532 F.3d at 618-19 (noting that the defendant had neither renewed his motion for a judgment of acquittal nor responded to the government's argument regarding waiver). Therefore, Brandt "may obtain a reversal only if he demonstrates a manifest miscarriage of justice." *Id.* at 619 (quotations omitted); *see also Hickok*, 77 F.3d at 1002.

Under the heightened "manifest miscarriage of justice" standard, "reversal is warranted only if the record is devoid of evidence pointing to guilt, or if the evidence

on a key element was so tenuous that a conviction would be shocking." *United States v. Squibb*, 534 F.3d 668, 671 (7th Cir. 2008) (quotations omitted). Because there was ample evidence to support the jury's finding that Brandt's statements were knowing and willful, Brandt cannot meet this high burden.

In his brief, Brandt suggests that he lacked the requisite knowledge and intent under § 1001 because he did not know that his conduct was illegal. (Petr.'s Br. 6 ("According to the Defendant and his girlfriend, the government agents never adequately warned him that his statement, 'I don't know what you're talking about', would implicate him in a federal crime. In other words, the Defendant never had the requisite criminal knowledge to lie to the federal agents.").) The Seventh Circuit has never addressed whether "willfully" under § 1001 requires proof that the defendant knew his conduct was a crime or simply that he knew his statement was false. While we note that to our knowledge, every other circuit to discuss this issue has rejected the notion that ignorance of the law negates willfulness under § 1001,[2] we need not

---

[2] *See United States v. Whab*, 355 F.3d 155, 161 & n.3 (2d Cir. 2004) ("[N]othing in the language or structure of 18 U.S.C. § 1001 suggests that 'willfully' requires proof that a defendant knew his conduct was a crime . . . ."); *United States v. Hsia*, 176 F.3d 517, 522 (D.C. Cir. 1999) (holding that the required mens rea for § 1001 was "that the defendant knew that the statements to be made were false"); *United States v. Daughtry*, 48 F.3d 829, 831-32 (4th Cir. 1995) ("[A]lthough Daughtry would have us
(continued...)

address this question today because there is sufficient evidence to support Brandt's conviction under even this more demanding interpretation.

The record contains more than enough evidence that Brandt willfully and knowingly lied to the ATF agents. Testimony by both agents regarding their conversation with Brandt was detailed and specific. According to the agents, even after repeated warnings that lying to federal agents was a crime, Brandt continued to maintain that he had never left the bar, that there was no gun, and that he was not involved in the gun sale. Furthermore, the fact that Brandt had been warned that ATF agents were coming to his house and that he told Beck and Smith not to discuss the purchase with the authorities shows that he acted willfully and with an intent to deceive the agents. Under any interpretation of "willful," this evidence is by no means "so tenuous that a conviction would be shocking." *See Squibb*, 534 F.3d at 671.

Brandt contends that there are "grave concerns" regarding the agents' recollection of the interview because the "agents failed to record the interview or make any verba-

---

[2] (...continued)

interpret the term 'willfully' in such a way that one cannot violate § 1001 without knowing that it exists, we will not do violence to the venerable principle that ignorance of the law generally is no defense to a criminal charge." (quotations omitted)), *rev'd on other grounds*, 516 U.S. 984 (1995); *United States v. Rodriguez-Rios*, 14 F.3d 1040, 1048 n.21 (5th Cir. 1994) (en banc).

tim transcript of it" and because Special Agent Edwards had no memory of his interview with Lemon, Beck's wife. (Petr.'s Br. 6.) Thus, Brandt maintains that the version of events to which he and Finn testified is more credible. Brandt made these arguments to the jury, and "[t]he jury, in turn, was free to reject them." *United States v. Obiuwevbi*, 962 F.2d 1236, 1239 (7th Cir. 1992). It is not our role on appeal to second-guess the jury's credibility determinations. *United States v. Roberts*, 534 F.3d 560, 569 (7th Cir. 2008). We need only determine whether the record is "devoid of evidence" pointing to Brandt's guilt. *See Squibb*, 534 F.3d at 671. Because the government presented clearly sufficient evidence that Brandt acted willfully and knowingly, the district court's denial of his motion for a judgment of acquittal will be affirmed.

B. *The district court's refusal to provide the jury with an "exculpatory no" instruction*

Brandt tendered to the district court an instruction, set forth earlier in this opinion, which the court referred to as the "exculpatory no" instruction. The district court refused to provide the jury with Brandt's tendered instruction because it was not an accurate statement of the law in light of *Brogan*. Brandt argues that the instruction was necessary to his defense that he did not have the requisite intent or knowledge to lie to the agents.

We review a district court's refusal to instruct the jury on a theory of defense de novo. *United States v. Van Allen*, 524 F.3d 814, 823 (7th Cir. 2008). Because we agree that

the defendant's tendered instruction is not an accurate statement of the law, we reject his argument.

In *Brogan*, the Supreme Court explicitly and unequivocally rejected the "exculpatory no" doctrine as a defense to criminal liability under § 1001. *See* 522 U.S. at 408. In that case, federal agents asked Brogan, the defendant, if he had ever accepted certain illegal cash payments or gifts. *Id.* at 399. Brogan replied "no," which was a lie. *Id.* The Supreme Court upheld his conviction, holding that "the plain language of § 1001 admits of no exception for an 'exculpatory no' . . . ." *Id.* at 408. Indeed, this court has previously recognized that after *Brogan*, the "exculpatory no" doctrine is no longer good law. *See United States v. Burke*, 425 F.3d 400, 409 (7th Cir. 2005).

Yet Brandt attempts to distinguish his case based on the fact that the defendant in *Brogan* did not dispute that his statement was made knowingly and willfully. Relying on Justice Ginsburg's concurrence,[3] Brandt argues that his proffered instruction was necessary in order for the jury to properly consider whether Brandt had sufficient intent. This argument is entirely without merit.

After *Brogan*, it is simply not accurate to say, as Brandt has asserted, that mere negative responses "*may not* be material or willful." Indeed, the fact that the defendant

---

[3] Brandt purported to rely on Justice Souter's concurrence. (Petr.'s Br. 5, 9-10.) However, the passages his brief cites are actually contained in the concurrence written by Justice Ginsburg. Although neither concurrence controls our interpretation of *Brogan*, we address his arguments.

in *Brogan* conceded that his response *was* knowing and willful shows that even a mere negative response can be an intentional lie. *See Brogan*, 522 U.S. at 401. Even Justice Ginsburg's concurrence did not go so far as to say that a mere denial could not be willful. She simply noted that the mere denial of criminal responsibility is not *sufficient* to prove knowledge or intent. *Id.* at 416 (Ginsburg, J., concurring). In this case, the district court never suggested that a mere denial was sufficient in the absence of the other requirements of § 1001. Indeed, the court instructed the jury on the meaning of the willfulness and knowledge requirements, and the jury found that Brandt's statements qualified. Thus, Brandt's argument that the jury was unable to properly address the issues of knowledge and intent because it was not given the "exculpatory no" instruction is unavailing.

Brandt also alludes to the Fifth Amendment in support of his argument. (*See* Petr.'s Br. 6.) However, as the Court noted in *Brogan*, "neither the text nor the spirit of the Fifth Amendment confers a privilege to lie." *Id*. at 404. Even Brandt's own recitation of the events shows that he lied when he told the agents, "I don't know what you're talking about." This type of false statement goes beyond the mere false denial that the Court in *Brogan* held that the Fifth Amendment did not cover. *See id.* Thus, because the "exculpatory no" doctrine provides no valid defense to liability under § 1001, the district court properly refused to provide Brandt's tendered instruction.

### III. Conclusion

We AFFIRM the district court's denial of Brandt's motion for a judgment of acquittal, as well as its refusal to instruct the jury on the "exculpatory no" defense.