$40,000

**HARRIS COUNTY, TEXAS, Plaintiff,**

v.

**Nancy E. GIST, Director of the Bureau of Justice Assistance, Dan Morales, Attorney General of Texas, and The City of Houston, Texas, Defendants.**

Civil Action No. H–96–3515.

United States District Court, S.D. Texas, Houston Division.

Dec. 13, 1996.

See also, 976 F.Supp. 620.

604

Bruce Stephen Powers, Office of Harris County Attorney, Houston, TX, for Harris County, Tex.

Vincent M. Garvey, Lisa A. Olson, Dept. of Justice, Washington, DC, for Nancy Gist.

Deborah Anne Verbil, Office of Attorney General, Austin, TX, for Dan Morales.

Hope Elizabeth Hammill–Reh, Houston, TX, for City of Houston.

### OPINION AND ORDER

ATLAS, District Judge.

### INTRODUCTION

Plaintiff Harris County ("County") has applied for a preliminary injunction, enjoining distribution of federal block grants to the City of Houston and to Harris County for

local law enforcement pending the Court's interpretation of a 1996 federal appropriations statute. *See* Application for Temporary [sic] Injunction [Doc. # 1]. The County has named three defendants: Nancy E. Gist, Director of the Bureau of Justice Assistance ("BJA") of the Department of Justice; Dan Morales, Attorney General of Texas ("Morales"); and the City of Houston ("City"). Also pending before the Court are Defendant BJA's Motion for Summary Judgment [Doc. # 11], Defendant Morales' Motion to Dismiss on grounds of personal jurisdiction and failure to state a claim against him [Doc. # 10], and Defendant City's Counterclaim for Declaratory Judgment [Doc. # 13].

By way of overview, the County contends that negotiations between the City and the County must take place to produce a joint application for funds before any of the block grant funds can be distributed by the BJA to either entity. The BJA and the City disagree with the County's position and contend that no joint application is required in the circumstances presented because either Attorney General Morales has not made either of the certifications that may trigger a joint application requirement or, if he has made one of the certifications, that certification alone does not require submission of a joint application. Morales has not taken a definitive position on these matters.

The Court has considered Plaintiff's Application, Defendant BJA's Motion for Summary Judgment, Defendant Morales' Motion to Dismiss, the responses and replies, all other matters of record in this case, and the relevant authorities. For the reasons stated below, Plaintiff's Application [Doc. # 1] is now **GRANTED IN PART**, Defendant BJA's Motion for Summary Judgment [Doc. # 11] is **DENIED,** and Defendant Morales' Motion to Dismiss [Doc. # 10] is **DENIED**.

This opinion reflects the Court's conclusions as to the proper interpretation of the statute in issue. The Court, in summary, holds that the statute is not ambiguous and therefore must be read literally. This ruling differs from the interpretation expounded by

the BJA, the federal agency charged with the statute's implementation, to the extent that the BJA contends that the law is ambiguous as applied to the circumstances presented. If Congress intended what the BJA has advocated, it has failed to express its intent and it should amend the statute to clarify its meaning.

This opinion thus addresses all statutory construction issues raised by the County in its declaratory judgment action and by the BJA in its Motion for Summary Judgment. This opinion, however, does not fully resolve all the County's contentions (because BJA's interpretation of Morales' actions is not clear) nor does it resolve the issues underlying the City's due process claim raised in its Counterclaim for Declaratory Judgment. To date, none of the parties has briefed or fully argued the City's due process issue. In addition, the Court is uncertain of its authority to address the City's due process claim. *See* *infra* notes 15 and 18. If the City intends to pursue its Counterclaim, it must submit a memorandum of legal authorities supporting its argument by December 31, 1996.

The Court does not perceive any need for further factfinding or litigation on the interpretation of the statute in issue and is prepared to grant summary judgment to the County. However, because the County has not yet moved for summary judgment, the Court will allow the parties until December 31, 1996, to brief any further issues they would like considered in light of this opinion or that require resolution before the Court enters final judgment for the County and against BJA and the City, as discussed herein.

### I. *FACTUAL BACKGROUND*

 In April 1996, as part of a federal appropriations bill, Congress established the Local Law Enforcement Block Grants Program to be administered by the BJA. *See* H.R. 728, 104th Cong., 1st Sess. (1995) (hereinafter "H.R. 728"), *incorporated in part into* the Omnibus Act of 1996, Pub.L. No. 104–134, 110 Stat. 1321–12.[1] Under the program,

---

**1.** The parties dispute whether Congress ever actually enacted H.R. 728 into law. The House passed H.R. 728 in 1995, but the bill was never separately presented to or debated in the Senate.

local governments receive federal funds to supplement their law enforcement budgets and have broad control over the decision how to use the funds. The program establishes a formula by which each unit of local government[2] receives a grant amount proportional to the average number of violent crimes that unit of government has reported to the FBI in the last three years. *See* H.R. 728 § 104(b)(3).

Congress recognized,[3] however, that the statutory formula might be unfair in some situations in which geographically overlapping units of local government, such as cities and counties, share responsibility for law enforcement in a certain area, but in which one or more of the government units make arrests and report crimes for which another unit administers justice after the arrests are made. Thus, in these situations, one or more units of local government may receive disproportionately large shares of funds for reporting crimes that another government unit prosecutes or for which another unit bears the costs of incarceration.

To address this potential disparity, the House passed an amendment to H.R. 728 which specifies conditions under which such overlapping units must decide together how to divide and spend their aggregate funds. Under the amendment, § 104(b)(9), if these conditions are met, the government units must submit a joint spending plan application to the BJA in order to receive their grants. It is the interpretation of the conditions that gives rise to this litigation. The text of § 104(b)(9)(A) is as follows:

Notwithstanding any other provision of this title, if—

(i) the attorney general of a State certifies that a unit of local government under the jurisdiction of the State bears more than 50 percent of the costs of prosecution or incarceration that arise with respect to part 1 violent crimes[4] reported by a specified geographically constituent unit of local government,[5] and

(ii) but for this paragraph, the amount of funds allocated under this section to—

(I) any one such specified geographically constituent unit of local government exceeds 200 percent of the amount allocated to the unit of local government certified pursuant to clause (i), or

(II) more than one such specified geographically constituent unit of local government (excluding units of local government referred to subclause I and in paragraph (7)), exceeds 400 percent of the amount allocated to the unit of local government certified pursuant to clause

In the Omnibus Act of 1996, which was passed by both chambers, Congress designated funds to be used for Local Law Enforcement Block Grants "pursuant to" H.R. 728. However, the text of H.R. 728 was not reprinted in the Omnibus Act. Although it is true that Congress could have expressed itself more clearly by incorporating the bill verbatim into the Act, the Court is persuaded, from the surrounding language in the Act and the absence of any other guidance directing the BJA how to implement the Program, that Congress did enact H.R. 728 into law through its passage of the Omnibus Act. In order to pass constitutional muster, a delegation of authority by Congress to an executive agency must contain an intelligible principle which guides the agency's implementation of the statute, *see Touby v. U.S.*, 500 U.S. 160, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991), and courts should construe statutes to avoid constitutional problems unless such construction plainly contradicts Congress' intention. *See Public Citizen v. United States Dept. of Justice*, 491 U.S. 440, 465–66, 109 S.Ct. 2558, 2572–73, 105 L.Ed.2d 377 (1989); *United States v. Haines*, 855 F.2d 199 (5th Cir.1988).

**2.** "The term 'unit of local government' means ... a county, township, city, or political subdivision of a county, township, or city, that is a unit of local government as determined by the Secretary of Commerce for general statistical purposes." H.R. 728 § 108(1)(A).

**3.** By incorporating H.R. 728 into the Omnibus Act of 1996, Congress implicitly adopted the reasoning of the House of Representatives, the only House of Congress that debated H.R. 728 or that voted on it specifically.

**4.** "The term 'part 1 violent crimes' means murder and nonnegligent manslaughter, forcible rape, robbery, and aggravated assault as reported to the Federal Bureau of Investigation for purposes of the Uniform Crime Reports." H.R. 728 § 108(5).

**5.** A "geographically constituent unit of local government" means "a unit of local government that has jurisdiction over areas located within the boundaries of an area over which a unit of local government certified pursuant to clause (i) has jurisdiction." H.R. 728 § 104(b)(9)(B).

*(i) and the attorney general of the State determines that such allocation is likely to threaten the efficient administration of justice,*

then in order to qualify for payment under this title, the unit of local government certified pursuant to clause (i), together with any such specified geographically constituent units of local government described in clause (ii), shall submit to the Director a joint application for the aggregate of funds allocated to such units of local government. Such application shall specify the amount of such finds that are to be distributed to each of the units of local government and the purposes for which such funds are to be used. The units of local government involved may establish a joint local advisory board for the purposes of carrying out this paragraph.

H.R. 728 § 104(b)(9)(A) (emphasis added).

In this action, Plaintiff Harris County contends that the relationship between it and the City of Houston satisfies the conditions of § 104(b)(9) and thus the provision requires the City to submit a joint funding application with the County. Specifically, the County argues that Subsection (i) is satisfied because the County bears more than 50 percent of the costs of prosecution or incarceration that arise with respect to part 1 violent crimes reported by the City and that Subsection (ii) is satisfied because, pursuant to Subsection

(ii)(I) (the "single city provision"), the amount of funds allocated under the statutory formula to the City exceeds 200 percent of the amount of funds allocated to the County.[6]

Upon initial consideration of the issue, Defendant Texas Attorney General Morales agreed with the County's position. In a letter dated September 19, 1996, Morales certified that, with respect to Harris County and the City of Houston as well as a number of other overlapping counties and cities in the State, the conditions of § 104(b)(9) had been met. *See* "Certification Letter," Exhibit C to Memorandum in Support of Plaintiff's Application for Temporary Injunction [Doc. # 8] ("Application").[7] However, the following week, Morales reconsidered the issue and, in a letter dated September 27, 1996, withdrew the certifications. See "Withdrawal Letter," Exhibit D to Application.

In his Withdrawal Letter, Morales explained that, although he could certify the satisfaction of the § 104(b)(9)(A)(i) statistical condition (that the County bears more than 50% of the relevant costs), he did not have authority under Texas state law to certify the satisfaction of the § 104(b)(9)(A)(ii) condition *italicized in the quotation above*, namely "that such allocation is likely to threaten the efficient administration of justice."[8] He also indicated that, in withdrawing the certifications,[9] he was relying on a letter dated July

---

6. Pursuant to the statutory formula, approximately $5.3 million has been allocated to the City of Houston, and $1.1 million has been allocated to Harris County. Table of Block Grant Allocations, Exhibit A to Application. Although the parties have referred to the 200 and 400 percent clauses in the statute as "conditions" subject to state attorney general certification, the statute does not actually require the state attorney general to make a certification regarding the satisfaction of either of these provisions. Instead, they are determined by the statutory formula in § 104(b)(3).

7. The Certification Letter clearly indicates that the Attorney General's office based this certification only upon information that was supplied by the affected cities and counties but did not itself review the underlying statistical information. Defendant City of Houston contends that it did not submit any such information and thus Morales' initial determination that Houston and Harris County meet the statistical requirements of § 104(b)(9) was based upon an ex parte review of the County's statistics alone.

8. According to his letter, Morales believed that the potentially affected cities and counties have a due process right to administrative hearings before such a determination is made and that the Texas Legislature has not yet given the Attorney General statutory authority to conduct such hearings.

9. It is not clear whether the withdrawal applied to the entire original certification, including the 50% statistical condition, or, as the County contends, only the "efficient administration of justice" condition. Morales' Withdrawal Letter states, "I can certify whether the 'two instances of disparity wherein an Attorney General may be asked by an affected jurisdiction to make certification to BJA' have been met [the 200%/400% conditions, which are determined by the local governments' allocations under the statute's formula]. I can further certify that the first of the two conditions required to be met in accordance with the letter by Ms. Gist, of July 25, 1996, has also been met [the § 104(b)(9)(i) condition that

25, 1996, sent to him by Defendant Nancy Gist, Director of BJA. *See* "BJA Letter," Exhibit B to Application. In the BJA letter, Gist explained what criteria the BJA believed § 104(b)(9) imposed on state attorney general certification.

Harris County argues that the BJA Letter misinterpreted § 104(b)(9). The County contends that the text of the provision, quoted above, clearly reflects that the condition that the Attorney General determine "that such allocation is likely to threaten the efficient administration of justice" attaches only to Subsection (ii)(II) (the "multiple city provision") and not to Subsection (ii)(I) (the "single city provision"). However, the BJA letter, in purporting to clarify the statutory provision, claimed that this additional non-statistical determination by the state attorney general attaches to Subsection (ii)(I) (the "single city provision") as well as to Subsection (ii)(II) (the "multiple city provision"). In other words, according to the BJA, in order for the provision's conditions to be fully satisfied and thus in order for *any* two or more local government units to be required to submit a joint application in order to receive funds under the statute, the state attorney general must first determine that the statutory allocation "is likely to threaten the efficient administration of justice."

The County rejects the BJA's interpretation and strenuously argues that because the City and the County, according to the County, meet the statistical requirements of subsection (i) (that the County bears more than 50 percent of the costs of prosecution or incarceration that arise with respect to part 1 violent crimes reported by the City) and of subsection (ii)(I) (that the amount of funds allocated under the statutory formula to the City exceeds 200 percent of the amount of funds allocated to the County, the "single city provision"), those facts alone require the City and County to submit a joint application. Therefore, according to the County, under the "single city provision," the state attorney general need not make the additional non-statistical determination which Morales has decided he does not have the statutory authority to make.

The County has brought this action seeking a declaratory judgment that (1) the BJA's interpretation of the statute is incorrect, (2) therefore, Morales' certification that the County bears more than 50 percent of the relevant costs of prosecution and incarceration was improperly withdrawn, and (3) since the requirements of § 104(b)(9) have been met with respect to the County and the City, the two must submit a joint application before the BJA may distribute funds to either entity under the statute.[10] In its Appli-

one unit of government bears more than 50% of the costs of prosecution and incarceration]."
The City argues that, although Morales stated that he *can* certify these conditions, his letter completely withdrew his original certification: "In light of what I have stated above, I am compelled to withdraw the certification stated in my September 19, 1996 letter. Please accept this letter as official notification of the withdrawal of the certification." Withdrawal Letter, Exhibit D to Application, at 2. The City further argues that it is too late for Morales to resubmit a new certification regarding the statistical conditions because the September 19, 1996, deadline, which the BJA set for state attorneys general to submit their certifications, has passed.
Since the statute does not specify the conditions by which certifications are to be accepted or rejected, the factual question of whether Morales' letter effectively withdrew his original certification entirely or only in part is one for the BJA, the administrative agency charged with implementation of the statute, and not this Court, to determine. However, in light of the facts that the BJA accepted Morales' withdrawal of certification after the original deadline and that the

BJA has not indicated that, despite this and other related pending litigation, it intends to abide strictly by that deadline, the Court assumes, for the purposes of this ruling, that the BJA would permit Morales to clarify or resubmit, if necessary, certification on the statistical conditions after the resolution of this lawsuit.

10. The County also argues that the BJA's interpretation is incorrect in that it specifies that when the state attorney general makes a determination about "the efficient administration of justice," that determination should consider the government units' "proposed use of the funds." According to the County, § 104(b)(9)(A)(ii)(II) requires consideration of only the "allocation of funds" and not any "proposed uses." In its Response, the BJA argues that it is entirely reasonable to assume that the determination of whether the "allocation of funds is likely to threaten the efficient administration of justice" requires a consideration of the·governments' proposed uses for the funds. Because the County does not contend that this distinction made any difference in Morales' decision to withdraw certi-

cation, the County seeks a preliminary injunction enjoining the distribution of funds to the County or City pending the Court's ultimate resolution of this controversy.[11]

In response, the City has filed a Counterclaim for a declaratory judgment that (1) the BJA's interpretation of the statute is correct, in that "when the 50 percent and 200 percent criteria in such section are properly certified, Section 104(b)(9) does require the Texas Attorney General to determine that the manner in which the respective jurisdictions within the counties propose to use funds received through the Local Law Enforcement Block Grants Program is 'likely to threaten the efficient administration of justice', prior to requiring that a joint application be filed" and (2) the City "is entitled to due process, including but not limited to the opportunity to present evidence of its costs of prosecution or incarceration with regard to part 1 violent crimes, prior to the Attorney General's determination of whether or not to issue the 50 percent certification." City of Houston's Counterclaim for Declaratory Judgment [Doc. # 13], at 5.

For the reasons discussed below, the Court accepts the County's claim that the BJA's interpretation of the statute is incorrect (and accordingly rejects the City's claim that the BJA's interpretation is correct) but is unable at this time to resolve fully the County's remaining two claims or the City's due process claim.

## II. *JUSTICIABILITY*

■ As a preliminary matter, the Court must determine whether it has jurisdiction, in light of the uncertainty regarding the status of Morales' certification of the 50% statis-

tical condition, to resolve the parties' dispute regarding the BJA's interpretation of the statute. Under the prudential doctrine of justiciability, a federal court should only decide a case in which there is a substantial likelihood that a decision in favor of a claimant will bring about some change or have some effect. *See* Erwin Chemerinsky, Federal Jurisdiction 50 (2d ed.1994). Specifically, in order for a plaintiff to have standing under the justiciability doctrine, the plaintiff must be able to prove (1) that it has suffered or will suffer some "injury," (2) that its injury is "caused" by the defendant's allegedly unlawful conduct, and (3) that its injury is likely to be "redressed" by the requested relief *Id.*, at 72; *Johnson v. Hospital Corp. of America*, 95 F.3d 383, 390 (5th Cir.1996).

The Court accepts Harris County's argument that it will suffer an "injury" if the BJA is not required to revise its interpretation of the statute. Without this revision, the City will not be required to submit a joint spending plan with the County and thus the County will not have the opportunity to negotiate for itself the direct receipt of a greater amount of program funds than it would otherwise receive under the statutory formula allocation.[12] In addition, it is apparent that the County's potential injury has been "caused" by the BJA's allegedly incorrect statutory interpretation because Morales clearly indicated in his Withdrawal Letter that he withdrew certification in reliance on the BJA Letter. Had Morales not been influenced by the BJA interpretation, he presumably would have maintained full certification, and the BJA would have accordingly conditioned the release of funds to the City

fication (since, in fact, Morales determined that he was not authorized to make any determination at all regarding the "efficient administration of justice"), there is no actual controversy before the Court regarding this argument and therefore the Court need not resolve this issue.

11. The parties indicated to the Court that, pending settlement negotiations which have since proven unsuccessful, the County and City agreed not to request distribution of program funds from the BJA until after December 13, 1996.

12. The City contends that its receipt of the funding will benefit the County as well as the City

since the funding will improve local law enforcement for City *and* County residents, even County residents who are not also residents of the City. The County maintains, however, that it needs more direct funding to support its prosecution and incarceration obligations and, in this respect, will not benefit from the City's enhanced ability to arrest criminal offenders. Indeed, the County implies that an increased numbers of arrests will heighten the pressure on the County's already strained prosecution and incarceration facilities and resources.

and County on their submission of a joint application.

■ The more difficult issue raised by this case, however, is "redressability." Even if the Court strikes down the BJA's interpretation, and the BJA determines that Morales effectively withdrew certification as to both the statistical *and* non-statistical conditions,[13] Morales might not resubmit certification as to the 50% statistical condition, which is indisputably required before the local governments would be required to submit a joint application.[14] Thus, even if Morales based his decision to withdraw certification upon an incorrect interpretation of federal or state law,[15] the County's resulting injury may not be redressable by any action of this Court. Except insofar as the Court may approve or reject the BJA's interpretation and concomitant implementation of the statute, the Court lacks the power to require Morales to submit any certification, to require that the BJA accept a belated resubmission of part of Morales' original certification (if the BJA determines that Morales withdrew his certification in its entirety on September 27, 1996), and thus to require that the BJA condition the release of program funds on the City and County's filing of a joint application.

■ However, the redressability requirement is not absolute. Instead, it is sufficient for the plaintiff to show that its injury is *likely* to be redressed by the requested relief. In an action brought under the Declaratory Judgment Act, federal court jurisdiction is satisfied if the court's ruling would settle an "actual controversy" between the parties. *See Chevron U.S.A., Inc. v. Traillour Oil Co.,* 987 F.2d 1138, 1154 (5th Cir.1993) (citing *Hardware Mut. Cas. Co. v. Schantz,* 178 F.2d 779, 780 (5th Cir.1949)). Even though an "actual controversy" in this case may be contingent on Morales' decision to certify the statistical condition (and the BJA's decision to acknowledge his earlier or accept a resubmitted certification), under the related justiciability doctrine of ripeness, "a case [is] ripe for adjudication notwithstanding the existence of some contingency to the claim if either (1) there is 'a substantial possibility' that the contingency will occur, or (2) the only questions being presented 'are purely legal ones.'" *In re Asbestos Litigation,* 90 F.3d 963, 992 (5th Cir.1996).

■ Here, the Court finds that it is likely that the contingency of Morales' certification as to the statistical condition will occur or has already occurred. *See supra* note 9. Although the City, in its Counterclaim, argues that it should have the opportunity to submit its own statistics regarding whether the County bears more than 50% of the costs of prosecution and incarceration before Mor-

---

**13.** As discussed *supra* note 9, the factual question of whether Morales' Withdrawal Letter withdrew his original certification entirely or only in part is one for the BJA, in its administrative capacity, to determine.

**14.** There are at least four conceivable reasons why Morales might not resubmit this certification. First, despite the Court's assumption to the contrary, the BJA may, in its administrative power, refuse to allow Morales to resubmit certification past the deadline. Second, Morales may, after consideration of the City's statistics, determine that the statute's 50% statistical condition has not in fact been met. Third, this Court or another authority may order that Morales must conduct formal factfinding before certifying as to the 50% statistical condition, and Morales may conclude, as he did regarding the non-statistical condition, that he does not currently have statutory authority to conduct the necessary hearings. Finally, Morales may simply choose, in his discretion, not to make the certification. The statute states that the joint application requirement

would be triggered "if" the state attorney general makes certifications regarding certain conditions, *not* simply "if" those conditions are met. Nowhere does the statute, which is a purely voluntary program with respect to both the local governments and the state attorneys general, require the state attorney general to take any action whatsoever, even if the specified conditions are in fact met.

**15.** The County does not argue that Morales' decision to withdraw certification was incorrect with respect to his interpretation of Texas state law that he does not have the authority to make the non-statistical determination regarding "the efficient administration of justice." If the County were to make this argument, the Court would probably not have the power to decide the issue because it would be a pendent state law claim. Under *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), federal courts do not have supplemental jurisdiction over state law claims brought by individuals against state officers.

ales makes this certification,[16] Morales has indicated in a post-hearing letter to the Court that he considers himself already to have certified the statistical condition. However, he limits this assertion with the observation that he cannot make this certification if the Court determines that the certification of the statistical conditions would require findings of fact.[17]

There is no provision in H.R. 728 empowering the Court to impose such a requirement on Morales. The statute requires a "certification," not a "finding of fact." Moreover, most importantly, H.R. 728 delegates administration of the grant program to the BJA, and the BJA has not imposed any factfinding or hearing requirements upon the

state attorneys general. In the absence of any specific argument by the City in support of its Counterclaim that due process entitles it to a formal factfinding proceeding regarding Morales' certification as to the 50% statistical condition, the Court concludes that the County has established a likelihood that Morales will not have to engage in such a procedure.[18]

Therefore, although the County's injury would not be *certain* to be redressed by a favorable ruling by this Court, the possibility is substantial enough to create federal jurisdiction in this case. In addition, the Court has jurisdiction because the only questions currently presented are legal and not factual.[19]

---

16. The County contends that it meets this condition so clearly that the Court should take judicial notice of that fact under Fed. R. Ev. 201:

> It is a matter of common knowledge that Harris County pays virtually all of the costs of prosecution and pretrial incarceration of persons accused of violent crimes in Harris County. The County is legally obligated to pay the salaries of the assistant district attorneys who try the cases, as well as their support staff, the fees of court appointed defense attorneys, the salaries of court support staff, court reporters and detention officers, the cost of food and medical care for inmates, the costs of maintaining and operating the Harris County Jail and the Harris County Criminal Courts building, and a portion of the salaries of the state district judges.

Plaintiff's Reply Brief, at 4. To support this claim, the County has submitted an affidavit from Richard L. Raycraft, the Harris County Budget Officer and Commissioners Court Coordinator, testifying that Harris County provides the primary source of funding for the County's jail facilities, District Attorney's Office, and Criminal District Courts.

In contrast, the City argues that because the statute does not define the terms "prosecution" and "incarceration," there is a substantial question of fact regarding whether the City or the County bears the majority of the costs actually at issue. None of the parties have formally requested that the Court interpret these statutory terms or briefed the matter, and so this issue is not presently before the Court. Because the parties dispute whether Morales may, as the situation currently stands, certify the 50% condition, the Court declines the County's request for judicial notice.

17. Page one of Morales' letter states that "the Attorney General has already certified both the first and second elements [the 50% and the 200/400% statistical conditions], and explained why he is unable to certify the third [the 'efficient administration of justice' condition]. Our position remains the same." Letter from Morales' Counsel to the Court, dated November 18, 1996. Morales states that "[i]f the Court interprets H.R. 728 to mean that, before the Attorney General could certify that Harris County incurs more than 50% of these costs, he must make findings of fact, the Attorney General submits that he lacks authority under state law to make such a determination. Absent guidance from the court, therefore, the Attorney General cannot certify this element." *Id.*, at 2. Finally, the letter concludes that the Court's "construction [of the statute] will determine whether or not the Attorney General has the authority to make certain certifications." *Id.*

18. The Court is not making a definitive ruling on this matter, however. Neither the statute nor the BJA provides guidance to assist state attorneys general in deciding whether or how to make a certification under § 104(b)(9). None of the parties has submitted arguments or briefing on the question of whether certification of the statistical condition requires, for federal statutory or constitutional reasons, that the state attorney general engage in a formal factfinding process. The City has not developed this argument before the Court, and the County has not responded to this claim except insofar as it contends that the condition is clearly satisfied under state law and common knowledge and that, in any case, Morales has already made that certification. The Court finds, not only that this issue has not yet been properly presented for decision, but also that it is unclear, in the apparent absence of controlling federal law, that the Court even has authority to rule on the matter. *See supra* note 15.

19. The City contends that there is still a factual issue regarding whether or not the County bears

## III. THE COUNTY'S APPLICATION FOR A TEMPORARY INJUNCTION

 Usually, preliminary injunctive relief is an extraordinary and drastic remedy that should be granted only when the movant, by a clear showing, carries the burden of persuasion on each element necessary to justify the injunction. *See House the Homeless v. Widnall,* 94 F.3d 176, 180 (5th Cir.1996); *Cherokee Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir.1994). In this case, the primary legal question underlying the County's Application, namely whether the BJA properly interpreted § 104(b)(9), has been fully briefed and appears ripe for a final disposition. In order to obtain preliminary relief, a movant must clearly demonstrate that:

(1) a substantial likelihood of success on the merits exists;

(2) a substantial threat of irreparable injury exists if the preliminary relief is not granted;

(3) the threatened injury to the movant outweighs any damage preliminary relief might cause to the opponent; and

(4) the relief sought will not disserve the public interest.

*House the Homeless,* 94 F.3d at 180; *Rodriguez v. United States,* 66 F.3d 95, 97 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1058, 134 L.Ed.2d 202 (1996). Applying these factors, the Court determines that the County is entitled to a portion of the preliminary injunction it seeks.

### A. Likelihood of Success on the Merits

 First, the Court concludes that the County is likely to prevail on the merits of its argument that the BJA misinterpreted § 104(b)(9).[20] Under the doctrine of *Chev-*

*ron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), a federal court must undertake a two-step analysis when evaluating a federal agency's interpretation of a statute. The federal court should consider these questions:

1. Did Congress speak unambiguously? If so, then the court must follow the plain meaning of the statute. If not, then the court must ask,

2. Did the agency adopt a permissible construction of the statute? If so, then even if the agency did not adopt the interpretation the court would have adopted, the court must defer to the agency's interpretation.

*See also United Services Auto. Ass'n v. Perry,* 92 F.3d 295, 298 (5th Cir.1996). Thus, under *Chevron,* the County must prove either that the BJA misinterpreted an *unambiguous* statute or that the BJA adopted an *unreasonable* interpretation of an ambiguous statute. A careful look at the statutory provision at issue convinces the Court that the statute is not, on its face, ambiguous. Therefore, the Court is obligated, under *Chevron,* to reject the BJA's attempt to redraft Congress' handiwork in § 104(b)(9).

 The BJA and the City strenuously argue that there is no logical reason, expressed either in the statute or in the legislative history of H.R. 728, for requiring the state attorney general to make the additional "efficient administration of justice" determination in the multiple city provision but not in the single city provision. The Court agrees that no such reason was ever articulated by Congress. However, the distinction between the multiple city and the single city provision is nevertheless clearly indicated by the paragraphing of § 104(b)(9). The sen-

---

more than 50% of the costs of prosecution and incarceration and has requested in its Counterclaim that the Court resolve the *legal* issue regarding whether it is entitled to factfinding by Morales. The statute clearly indicates that Morales must resolve the *factual* issue of whether the condition is satisfied. The City has provided no authority for its view that the Court may direct Morales as to how to perform this function. In general, the Court declines to substitute its judgment for that of the state official to whom Congress delegated the duties in issue. If the City

has specific authority that supports the relief sought, the City may submit a memorandum to the Court as directed in the Order hereinafter.

20. The analysis in this section applies only to the County's request for a declaratory judgment that the BJA misinterpreted § 104(b)(9). Given the relief the Court deems appropriate, the Court does not have to reach the issue in the City's Counterclaim for Declaratory Judgment that due process entitles it to present its own statistics to Morales before he may certify the 50% condition.

tence referring to "the efficient administration of justice" is included in the multiple city provision, § 104(b)(9)(A)(ii)(II), but is not in the single city provision, § 104(b)(9)(A)(ii)(I). Under the "rule of the last antecedent ... 'qualifying words, phrases, and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to ... others more remote.'" *U.S. v. Martinez*, 894 F.2d 1445, 1449 (5th Cir.1990), *cert. denied*, 498 U.S. 942, 111 S.Ct. 351, 112 L.Ed.2d 315 (1990) (quoting *Quindlen v. Prudential Insurance Company of America*, 482 F.2d 876 (5th Cir.1973)). Also, "'[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Garcia v. United States*, 88 F.3d 318 (5th Cir.1996) (citing *Gozlon–Peretz v. United States*, 498 U.S. 395, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991); *Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)). In light of these rules of statutory construction, the Court rejects Defendants' argument that the mere placement of the "efficient administration of justice" sentence in the paragraph containing the multiple city provision, instead of in the unindented text following that paragraph, creates ambiguity in the text of the statute.

Furthermore, the statute as drafted, with the distinction between the single city and multiple city provisions, is not absurd or even unreasonable. *See In re Abbott Laboratories*, 51 F.3d 524 (5th Cir.1995) ("the statute is the sole repository of congressional intent where the statute is clear and does not demand an absurd result"); *U.S.v. Rodriguez–Rios*, 14 F.3d 1040, 1044 (5th Cir.1994) (en banc) (courts may deviate from the literal language of a statute "only if the plain language would lead to absurd results, or if such an interpretation would defeat the intent of Congress"). The County has offered two logical explanations for the apparent distinction between the single city and multiple city provisions. First, it argues that

> Congress could well have believed that allocating twice as much funding to a single city, as compared to a county, was clearly inequitable. However, allocating four

times as much money to a *group* of cities may or may not be inequitable.... [In this case,] the disparity of allocation between each individual unit of local government is not so extreme.

Plaintiff's Reply Brief, at 3. Second, the County suggests that "Congress may have been reluctant to require such a large group to negotiate a joint spending plan" whereas "one city and one county may quickly reach an agreement to jointly spend grant funds," *id;* "[t]hus, the purpose of an attorney general's determination regarding a threat to the efficient administration of justice may have been added to subparagraph II to *limit* the requirement to negotiate when there are a number of cities involved," *id.*

■ Although these proposed rationales for the distinction between the single city and multiple city provisions are not drawn from the statutory text or even the legislative history, there is no requirement that a party be able to point to a written justification for a clear statutory mandate. *See Pioneer Investment Services v. Brunswick Associates*, 507 U.S. 380, 388, 113 S.Ct. 1489, 1494–95, 123 L.Ed.2d 74 (1993) ("There is, of course, no more persuasive evidence of the purpose of a statute that [sic] the words by which the legislature undertook to give expression to its wishes"); *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240, 109 S.Ct. 1026, 1029–30, 103 L.Ed.2d 290 (1989) (in analyzing a significant piece of legislation, "it is not appropriate or realistic to expect Congress to have explained with particularity each step it took").

The BJA argues that Congress' primary intention in enacting the Local Law Enforcement Block Grants Program was to minimize federal involvement and maximize local involvement "in decisions regarding funding allocations among units of local government." BJA's Motion for Summary Judgment, at 4. Indeed, the substance of the program and even its title clearly support this contention. However, the BJA has not persuaded the Court that this purpose would in any way be thwarted by the Court's enforcement of § 104(b)(9)'s distinction between the single city and multiple city situations. The distinc-

tion merely requires that, in one situation, where a disparate grant allocation will otherwise occur, a state attorney general may require two overlapping local governments to submit a joint application by certifying one condition (that the government unit that was allocated less funds bears more than 50% of the costs of prosecution and incarceration), and in the other situation, where multiple local governments are involved, the attorney general may trigger this requirement by certifying two conditions (both the 50% condition and that the "allocation is likely to threaten the efficient administration of justice"). In either situation, the event triggering a joint application requirement, if it occurs at all,[21] is performed at the state and not the federal level.

■ The BJA and the City argue that because the statute was hastily thrown together and because H.R. 728 was not even subjected to independent scrutiny by the Senate as it was by the House, the Court should not enforce a distinction that rests solely on the placement of a paragraph indentation. Instead, they argue, the BJA's interpretation is a reasonable clarification of what appears to be a "scrivener's error" in drafting the statute. The Supreme Court has in fact directed that courts should "disregard the punctuation, or repunctuate, if need be, to render the true meaning of the statute." *U.S. Nat. Bank of Oregon v. Independent Ins. Agents*, 508 U.S. 439, 452–55, 461–63, 113 S.Ct. 2173, 2182, 2186, 124 L.Ed.2d 402 (1993) (quoting *Hammock v. Farmers Loan and Trust Co.*, 105 U.S. 77, 26 L.Ed. 1111 (1881)). However, in cases in which

courts have repunctuated, they have either (1) found some basis for ambiguity in the text of the statute, *see, e.g., id,* (2) found that a literal interpretation would lead to an impossible result, *see, e.g., Nobelman v. American Sav. Bank,* 508 U.S. 324, 330–32, 113 S.Ct. 2106, 2111, 124 L.Ed.2d 228 (1993) (avoiding rule of the last antecedent because administration of the statute as written would be "impossible"), or (3) found legislative history suggesting that a clerical error altered the statute's intended punctuation, *see, e.g., State of N.Y. v. Shore Realty Corp.,* 759 F.2d 1032, 1043 n. 16 (2d Cir.1985).[22] In the case at bar, Defendants have not identified any textual ambiguity, impossible outcome, or specific historical evidence by which the Court may find that the paragraphing of § 104(b)(9) was a clerical error.

Congress gave the courts, the BJA, the states, and the local governments no indication other than the statutory language itself of whether or not it intended to create a material procedural distinction between the single city and multiple city provisions.[23] In light of this total absence of reasoning or expressed purpose, the Court is left to rely solely on a plain reading of the statute's text. *See Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("courts must presume that a legislature says in a statute what it means and means in a statute what it says there"). In short, the Court has found no grounds for reading ambiguity into the statute.

Both sides in this dispute have cited the statute's scant legislative history to support their positions. Even if the Court could

**21.** Without any attorney general certification the funds are still available to the local government units pursuant to the block grant allocation formulas.

**22.** During oral argument, the City called attention to this case, in which a court deemed a phrase located at the end of the last of four subparagraphs to modify all four subparagraphs and not just the one in which it was located. *See State of N.Y. v. Shore Realty Corp.,* 759 F.2d 1032, 1043 n. 16 (2d Cir.1985) ("[t]he phrase ... is incorporated in and seems to flow as if it were a part only of subparagraph (4), but it is quite apparent that it also modifies subparagraphs (1)-(3) inclusive"). However, the *Shore Realty* court was able to point to an earlier version of the bill

in which the phrase at issue was printed on a separate line from the final subparagraph and thus the court concluded that the phrase only inadvertently slipped into the final subparagraph as the result of a printer's error. *See id.*

**23.** The BJA informed the Court that only several state attorneys general have reached Morales' conclusion that state law precludes their certification of one or more of the statute's conditions without first holding administrative hearings which they lack authority to convene. It is entirely possible that Congress did not anticipate that the state attorneys general would play as a major a role as Morales has played in this dispute.

consider such analysis, *see Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (courts "do not resort to legislative history to cloud a statutory text that is clear"), it finds that this source provides no support for either side in this controversy. In fact, in the Congressional Record's transcription of the House debate on the § 104(b)(9) amendment, the only remark made in the debate which even refers to the distinction between the single city and multiple city provisions is printed with the same paragraphing that appears in the final bill and thus identically mirrors the structure of the enacted provision.[24] The legislative history thus lacks an indication of any purpose, one way or another, supporting or rejecting the disputed distinction between the single city and multiple city situations.

Because the Court finds that the statute is unambiguous on its face, it is compelled under *Chevron* to enforce the plain meaning of the statute. Since the BJA's interpretation of the statute contradicts the statute's clear text, the Court must reject the BJA's interpretation. *See Demarest v. Manspeaker,* 498 U.S. 184, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991) (administrative interpretation that contradicts the literal language of a statute "is not entitled to deference").

### B. *Irreparable Injury*

▆▆▆▆▆ Defendants argue that the County cannot prove it would suffer irreparable injury because the County alleges only potential monetary damages. Under *Enterprise Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472–73 (5th Cir.1985), "injury is irreparable only if it cannot be undone through monetary remedies." The County did originally argue that an unfavorable ruling would deprive it "of its equitable share of the block grant funds which Congress intended it to receive." Application, at 3. This argument would have failed because it is an assertion of only monetary damages and because it is entirely speculative.[25]

However, the County later asserted that it would suffer irreparable injury because, in the absence of an injunction, it would lose "the congressionally mandated right to negotiate for a more equitable allocation of federal grant funds." Reply, at 3. With respect to this argument, the Court agrees that if its application for a preliminary injunction is denied, the County is likely to suffer irreparable injury.[26] The City has expressed the view that, after the funds are distributed, it would not be legally immune to an attempt by the County to recapture any of the funds if it is later determined that the County was correct in its interpretation of the statute. The Court concludes, however, that this assertion does not sufficiently address the County's concern. Because a state attorney general's certification as to the statistical relationship described in the statute would require the BJA to condition release of the funds on the submission of a joint application

---

24. Representative Chabot, who offered § 104(b)(9) as an amendment to H.R. 728, made the following remarks:

> Clearly, arrests made by jurisdictions within these counties have significant implications for county budgets. What this amendment does, Mr. Chairman, is say that where the attorney general of a State, in his discretion, sees fit to certify that a county bears the bulk of prosecution or incarceration costs associated with violent crimes committed in a city within that county, and where the formula in this bill, nonetheless, allocates to one city government at least twice as much of the grant money, then the city and the county have to get together and agree on the ways that their combined grant money should be spent.
> The same situation would obtain where a number of cities within a county added together would be eligible for a total grant amount

exceeding 400 percent of what the county would get. If the state attorney general determines that such a situation threatens the efficient administration of justice, then the cities and the counties would be required to work together.

Plaintiff's Application, at 5–6 (quoting Vol. 141 Cong. Rec. H1664 (1995) (Exhibit G to Application)).

25. Even if the City and County are required to submit a joint application, the County has no guarantee that its share of program funds would increase.

26. Recently, another federal district court accepted this argument and accordingly granted a preliminary injunction in a related case. *See Dallas County, Texas v. Bureau of Justice Assistance, et al.* No. A–96–CA–687 (W.D. Tex., Austin Division, Nowlin, J., Nov. 7, 1996).

by the City and County, the statute gives the County certain bargaining power over the City. Until the BJA releases the finds, the County retains the potential ability to prevent the City (and itself) from obtaining any of its grant. If the City and County are required to submit a joint application, this negotiating position would be significant because it might indeed increase the County's direct share of funding.

The City is correct in noting that when the House debated amending H.R. 728 with § 104(b)(9), some members were concerned about the possibility of counties abusing their leverage in this situation.[27] However, in spite of these concerns, the amendment passed. The Court may not temper its interpretation of a statute by reference to arguments made by the losing side of a Congressional debate.[28]

If the Court denies the County's application for a preliminary injunction and the BJA releases funds to the City and County pursuant to the statutory formula, then, if the County ultimately prevails in its declaratory judgment action, there would be no legal means by which the BJA could ever recapture the money and hold it until the City and County agree on a joint spending plan. The statute allows the BJA to take back funds that the local governments have not spent by the end of the two year program, see H.R. 728 § 101(f)(1), but it does not provide any mechanism for the BJA to take back funds and reinstitute the joint application requirement once the funds have been distributed to overlapping units not originally required to apply for funding together.[29] Therefore, the Court concludes that the County would suffer irreparable injury if its application is denied.

### C. Balance of the Harms to the Respective Parties

The City argues that this injunction would cause it great harm because such an action would delay the City's receipt of the funds to which it is entitled.[30] The County responds that the denial of the injunction would cause it irreparable harm, for the reasons explained above. The Court concludes that, on balance, the County's risk of irrepa-

27. Representative Conyers worried that "where a city has a large allocation of funds ... and the county has less, forcing the city and county together is going to operate to the detriment of the city." Representative Volkmer noted that if the "city is not able to persuade the county to work with them and make an application, nobody gets any money." Volkmer continued:

What we are doing here is putting the political subdivision that has a large area, a large population and small eligibility into the driver's seat in terms of an accord being worked out at the peril of the municipality not receiving anything. That, I think, would be a position we would not want to write into the bill, because it would put every city, particularly every major city, at a horrendous disadvantage.

Vol. 141 Cong. Rec. H1665–66 (1995), Exhibit E to Defendant City's Response in Opposition to Plaintiff's Application for Temporary Injunction [Doc. # 9].

28. In any event, the Court presumes Congress concluded that both the city and county in these circumstances would act in their mutual best interest by finding an acceptable compromise. See Representative Chabot's remarks, id., at 1665 ("It would be up to the city and county to work together to come up with an agreement, because otherwise ... neither would get the money, so it is definitely to their advantage to come up with an agreement").

29. The City contends that once it receives its funds, it will not be able to spend them immediately because local law imposes a number of procedural requirements the City must satisfy before it may finalize its allocations. Although this delay raises the theoretical possibility that the BJA might be able to step back in and recapture the funds if its original disbursement is found to violate the statute, it is far from clear that the BJA would have the statutory authority to maintain such involvement or that a court would have the power to order the BJA to reposition itself once again as a gatekeeper with respect to § 104(b)(9). In addition, once the funds are received by the City, there is no incentive for it to negotiate meaningfully with the County, even if the Court were to direct the parties to do so in an attempt to enforce the foregoing interpretation of § 104(b)(9).

30. The City has also suggested that a delay might risk the possibility that the City would not have time to establish programs and spend all of its allocation within the two year time period. H.R. 728 § 101(f)(1) requires recipients to use the funds within two years from their receipt of the funds or return them to the federal government. However, because the statute provides recipients two years from the date on which they receive the funds to spend them, rather than a uniform deadline, this argument is without merit.

rable injury outweighs the City's injury that would be caused by delay.

The City also is concerned that if the City and County are required to submit a joint application but cannot reach agreement after negotiation, neither will ever obtain any funds under the program. However, as discussed earlier, Congress accepted this possibility when it enacted § 104(b)(9). *See supra* notes 27 and 28. Moreover, the Court cannot predict the impact of the BJA's final interpretation of its deadlines for certifications by the state attorneys general and for submissions of local governments' funding applications or of the BJA's conclusions regarding the current status of Morales' certification.

Furthermore, because the Court has determined—after the parties' exhaustive briefing and argument—that the County's statutory interpretation is legally correct, this conclusion may in fact resolve the entire case. While it is premature for the Court to enter a final declaratory judgment, the Court expects to resolve this matter within no more than a few months of this Opinion and Order. Therefore, the delay will cause the City little or no harm. Moreover, to the extent the Court's ruling will result in Morales certifying the statistical 50% condition (if the BJA does not find that he has already done so), the City will be required to negotiate with the County, a result the Court has concluded was intended by Congress and does not constitute a "harm" to the City.

Entry of a preliminary injunction will also not harm Defendants BJA and Morales. The injunction will merely delay the probable dispersal of program funds from the BJA to the City and County. Thus, the BJA will only be affected in that it will have to retain the funds for longer than it expected. Morales will not be affected in at all.

#### D. *Public Interest*

■ The City argues that this injunction would be against the public interest, since the program in issue was established by Congress to benefit the public by providing more funding for law enforcement. Delaying the disbursement of the grant funds would hurt the people of Houston and Harris County, the City claims, by postponing establishment of new law enforcement programs.

However, for the reasons described above, the Court has determined that in this case § 104(b)(9) most likely does not allow the BJA to release the program funds to the City unless it submits a joint application with the County. The Court may not circumvent this congressionally mandated requirement.

Most significantly, the City's argument is ephemeral. To the extent the City and County must submit a joint application, the City and County themselves hold the power to force the release of the funds. All that would be necessary to prompt funding would be the creation of a compromise plan by these parties. It is not this Court's role to save the City and County leaders from their own recalcitrance. This Court believes the community leaders will act reasonably and rationally, as Congress apparently envisioned they would do when it enacted § 104(d)(9).

#### IV. *BJA'S MOTION FOR SUMMARY JUDGMENT*

Defendant BJA has moved for judgment as a matter of law in this action. Plaintiff Harris County has responded to BJA's Motion, *see* Plaintiff's Response to Federal Defendant's Motion for Summary Judgment [Doc. # 23], and does not contend that this case raises any issue of material fact requiring decision by the Court or a jury. The Court's analysis in Section III.A. ("Likelihood of Success on the Merits") resolves the issues in BJA's Motion for Summary Judgment. The Court concludes that the County's interpretation of § 104(b)(9) is correct as to the "efficient administration of justice" provision and that therefore judgment on this issue as a matter of law should be granted in favor of the County and against the City and the BJA. For this reason, the Court denies Defendant BJA's Motion for Summary Judgment.

■ The County, however, has not filed a Motion seeking a final summary judgment in its favor. The Federal Rules of Civil Procedure allow a district court to grant summary judgment on its own initiative to a nonmoving party so long as the court gives

appropriate notice to the losing party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 28 F.3d 1388, 1397 (5th Cir.1994); *NL Industries, Inc. v. GHR Energy Corp.*, 940 F.2d 957, 965 (5th Cir.1991), *cert. denied*, 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992) ("Rule 56(c) allows a court to grant a summary judgment in favor of a party that did not request it"). The Fifth Circuit has held that ten days' notice to the losing party is sufficient prior to entering summary judgment sua sponte. *Leatherman*, 28 F.3d at 1397 (citing *Judwin Properties, Inc. v. United States Fire Ins. Co.*, 973 F.2d 432, 436–437 (5th Cir.1992); *Powell v. United States*, 849 F.2d 1576, 1579 (5th Cir.1988)).

Therefore, the Court will allow the parties until December 31, 1996, to submit memoranda of law on any issues that they believe require resolution or further attention by the Court. In particular, if the City intends to pursue its Counterclaim or if any of the parties have additional authorities on matters not definitively determined, which they believe preclude the entry of summary judgment in favor of the County as outlined in the Order at the end of this Opinion, then each of those parties must submit, by December 31, 1996, a memorandum of legal authorities supporting its position.

### V. *MORALES' MOTION TO DISMISS*

■■■■ Defendant Morales has moved for his dismissal from this case on grounds of personal jurisdiction under Fed.R.Civ.P. 12(b)(2), failure to state a claim against him under Fed.R.Civ.P. 12(b)(6), and qualified immunity. The Court finds no merit to his qualified immunity argument as this action has been brought against him in his official, not his individual, capacity. *See Ashe v. Corley*, 992 F.2d 540, 545 n. 7 (5th Cir.1993); *Kentucky v. Graham*, 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105–06, 87 L.Ed.2d 114 (1985) (qualified immunity is defense to suit brought against official in individual capacity). Regarding his Rule 12(b)(6) argument, it is true that the statute at issue in this case does not impose any affirmative obligations on Morales. However, his actions are central to the parties' dispute. The County named him as a defendant "to insure that all parties whose rights might be affected by a declaratory judgment are properly before the Court." Plaintiff's Response to Defendant Morales' Motion to Dismiss [Doc. # 23]. The Court finds that Morales is a necessary party and sees no reason to grant his Rule 12(b)(6) Motion for Dismissal, especially considering the Court's intention to dispose of the case fully in a short time.

■■■■ As for Morales' Rule 12(b)(2) argument, the Court finds no merit to his claim that *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), bars an action brought against him in his official capacity. Under the doctrine of *Ex parte Young*, federal courts may exercise jurisdiction over state officers as long as the officers are sued in their official capacities as agents of the state and the relief sought is declaratory or injunctive in nature and prospective in effect. *See Saltz v. Tennessee Dept. of Employment*, 976 F.2d 966, 968 (5th Cir.1992). In *Seminole Tribe*, the Supreme Court cut back on federal jurisdiction over suits brought against a State or its officers, but it affirmed the continuing exception of the *Ex parte Young* doctrine. *Seminole Tribe*, 517 U.S. at ——–——, 116 S.Ct. at 1132–33. *Seminole Tribe* did not eliminate the *Ex parte Young* exception but simply found it inapplicable to a suit brought under a statute which contained what the Court determined to be an unconstitutional, intricate remedial scheme through which plaintiffs could bring suit against a State or its officers. In contrast, the Local Law Enforcement Block Grants Program does not have a specific remedial scheme providing plaintiffs means of redress against a State or its officers, and so the doctrine of *Ex parte Young* would still allow a federal court to exercise jurisdiction over a suit arising under this statute which names a State officer as a defendant.

### VI. *THE CITY'S COUNTERCLAIM*

As noted earlier, the City has filed a Counterclaim for a declaratory judgment that (1) the BJA's interpretation of the statute is

correct and (2) the City "is entitled to due process, including but not limited to the opportunity to present evidence of its costs of prosecution or incarceration with regard to part 1 violent crimes, prior to the Attorney General's determination of whether or not to issue the 50 percent certification." City of Houston's Counterclaim for Declaratory Judgment [Doc. # 13], at 5.

The Court's conclusion that the BJA misinterpreted § 104(b)(9) resolves the first prong of the City's claim. However, as discussed earlier, neither the City nor any of the other parties have presented any focused argument on the second prong of the City's claim. It also is not clear whether the issue is moot. Therefore, the Court will await further briefing by the parties, if they deem it necessary, before resolving the City's due process argument on the merits.

### ORDER

For the foregoing reasons, **Plaintiff's Application for a Temporary** [sic] **Injunction** [Doc. # 1] is **GRANTED IN PART**, as set forth below:

It is hereby **ORDERED** that:

1. H.R. 728 § 104(b)(9)(A)(ii)(I) does not require state attorney general certification regarding the "efficient administration of justice."

2. The Bureau of Justice Assistance ("BJA") shall require a joint funding application for Local Law Enforcement Block Grants from Harris County and the City of Houston if Attorney General Morales certifies or is deemed by the BJA to have certified the 50% condition in H.R. 728 § 104(b)(9)(A)(i), regardless of whether Morales makes a certification regarding the "efficient administration of justice." It is further

**ORDERED** that the BJA shall promptly inform the parties and the Court of its determination regarding the effect and timeliness of Attorney General Morales' letter withdrawing certification under H.R. 728 and shall state specifically whether the 50% condition in § 104(b)(9)(A)(i) has been properly certified with respect to Harris County and the City of Houston. It is further

**ORDERED** that, if necessary in light of the foregoing, the BJA shall notify the parties and the Court of any new deadlines by which Attorney General Morales must issue whatever certifications he intends to make. It is further

**ORDERED** that, if necessary in light of the foregoing, the BJA shall notify the parties and the Court of any new deadlines for Local Law Enforcement Block Grant funding requests. It is further

**ORDERED** that **Federal Defendant** [BJA]'s **Motion for Summary Judgment** [Doc. # 11] is **DENIED**. It is further

**ORDERED** that **Defendant Dan Morales' Motion to Dismiss** [Doc. # 10] is **DENIED**. It is further

**ORDERED** that the BJA and City shall show cause by December 31, 1996, why the Court should not enter summary judgment in favor of the County as to its statutory interpretation of H.R. 728 § 104(b)(9)(A)(ii)(I). It is further

**ORDERED** that the parties shall each show cause by December 31, 1996, why the Court should not enter final judgment in this case in conformity with this Opinion and Order. The parties must submit, by December 31, 1996, memoranda of legal authorities supporting their arguments regarding any remaining issues that they believe require resolution before this case reaches a final disposition. In particular, if the City intends to pursue the due process prong of its Counterclaim for Declaratory Judgment, it must submit a memorandum supporting this claim by December 31, 1996.